**UNITED STATES of America**

v.

**Charles T. MUNTAIN, a/k/a "Red Muntain", Appellant.**

**No. 78–2150.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 24, 1979.

Decided Oct. 31, 1979.

Plato C. Cacheris with whom Larry S. Gondelman, Washington, D. C., was on the brief, for appellant.

Michael J. Ryan, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Michael W. Farrell and Robert Richard Chapman, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Also William J. Birney, Asst. U. S. Atty., Washington, D. C., entered an appearance for appellee.

Before ROBINSON and WILKEY, Circuit Judges, and LARSON,* United States Senior District Judge for the District of Minnesota.

Opinion for the Court filed by Senior District Judge LARSON.

LARSON, Senior District Judge:

Defendant Charles T. Muntain appeals his conviction on eight counts of a thirteen count indictment charging him with improper conduct, in violation of 18 U.S.C. §§ 201(g), 209, 371, and 1001. At the time of his conviction Muntain was the Assistant to the Secretary for Labor Relations for the United States Department of Housing and Urban Development (HUD). Four of the counts on which Muntain was convicted (Counts 5, 7, 9, and 11) alleged that on several occasions the defendant, "being a public official . . . unlawfully and

* Sitting by designation pursuant to 28 U.S.C. § 292(d) 1976.

knowingly did, directly and indirectly, ask, demand, solicit and receive for himself . . ." illegal gratuities "for and because of official acts . . . .", in violation of 18 U.S.C. § 201(g). Under Count 3 of the indictment Muntain was further convicted of having received an illegal contribution to his salary from a source other than the United States Government, in violation 18 U.S.C. § 209.

Count 1 charged defendant with violating 18 U.S.C. § 371 by participating in a conspiracy having two objects: (1) to defraud the United States of the "conscientious, loyal, faithful, disinterested and unbiased services, actions and performances of official acts and duties" by the defendant free from concealed interests; and (2) to violate 18 U.S.C. § 201(g). Finally, defendant was convicted on Counts 4 and 13 of having filed false statements with HUD which concealed his involvement in the automobile insurance venture.

Following his conviction by a jury, defendant moved for a judgment of acquittal or, in the alternative, a new trial. The Court denied both motions and imposed a suspended sentence, placing defendant on five years probation.[1] From that judgment, defendant appeals. For reasons to be discussed, we affirm in part and reverse in part the decision of the Court below.

The Government's case against Muntain was based upon his involvement in a private scheme to sell group automobile insurance to labor unions as a negotiated benefit in union contracts at a time when he was employed as the Assistant to the Secretary for Labor Relations at HUD. In his capacity at HUD, Muntain functioned as the principal labor relations policy advisor and consultant to the Secretary, the chief liaison between HUD and organized labor and the chief Department spokesman on labor relations matters. His responsibilities at HUD brought Muntain into frequent contact with contractor associations, trade associations and unions regarding labor relations and labor relations policies affecting programs and projects within HUD's jurisdiction. The Government did not contend and produced no evidence at trial, however, to suggest that automobile insurance as a benefit for labor unions fell within HUD's jurisdiction.

The plan to sell automobile insurance with which Muntain became involved originated with an agreement negotiated by Charles Cordial, an unindicted coconspirator in this case, with a company called Group Marketing Consultants, Inc. (GMCI). Under this agreement, Cordial and Deryl Fleming, another unindicted coconspirator, became consultants to GMCI to assist in the mass marketing of group auto insurance. Within a month after signing the agreement with GMCI in February 1974, Fleming and Cordial contacted Muntain in Washington to obtain his assistance in marketing group automobile insurance to labor unions. Both Fleming and Cordial testified at trial that they sought Muntain's help because he knew labor people and they hoped that he would open doors for them by introducing them to these people. In exchange for his assistance, Muntain was to be reimbursed for any expenses he incurred. In addition, he was to share equally in any commissions that might be generated from the sale of insurance. Cordial and Fleming both testified that, pursuant to an oral agreement entered into in early 1974 and later reduced to writing, it was understood that Cordial, Fleming and Muntain were to be equal partners in the group automobile insurance venture.

In the ensuing months during 1974 and 1975, Muntain arranged and participated in a number of meetings around the country with labor officials at which Fleming and Cordial were introduced and the concept of group automobile insurance discussed. Many of these same labor officials, according to testimony, had dealings with HUD concerning official HUD business. In fact, Muntain would frequently combine the pro-

---

1. As part of the terms of his probation, defendant was required by the Court to contribute 100 hours of community service work without compensation as directed by the Probation Officer of the Court.

motion of the automobile insurance with trips taken at government expense for the purpose of conferring with labor officials across the United States concerning official business. In connection with at least some of the trips paid for by the Government, evidence was introduced suggesting that Muntain requested and received supplementary "reimbursement" from Cordial and Fleming for expenses he claimed were incurred in arranging and attending meetings to promote the insurance plan.

In addition to his domestic travels, Muntain, accompanied by his wife, took a ten day trip to Ireland in May 1974 as part of a charter tour organized by the International Laborers Union. This trip, which formed the basis for Count 3 of the indictment, was taken at the insistence of Fleming and Cordial who testified that they wanted Muntain along to introduce them to the labor officials who would be going on the trip. At the time of the trip, Muntain was on annual leave from his position at HUD.

The final evidence relevant to defendant's appeal consists of testimony and documentary evidence that in June of 1974 and again in 1975 defendant caused to be filed with the Office of General Counsel at HUD a Confidential Statement of Employment and Financial Interests which failed to disclose defendant's involvement in the group automobile insurance enterprise.

■ The first of the statutory provisions under which Muntain was convicted, 18 U.S.C. § 201(g), proscribes the receipt by a public official of anything of value "for or because of an official act performed or to be performed by him."[2] "Official act" in turn is defined in § 201(a) as:

"any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in his official capacity, or in his place of trust or profit."

At trial the Government contended that Muntain's efforts to promote, or to assist Fleming and Cordial in promoting, the group automobile insurance plan with labor officials, and his encouragement of HUD subordinates to assist in that promotion, fall within the proscription of § 201(g). Muntain argues on appeal, however, that none of his activities undertaken in furtherance of the insurance scheme constitute "official acts" within the meaning of § 201(a) and, therefore, he cannot be held to have violated § 201(g).

Specifically, Muntain contends that his meetings with labor officials concerning the insurance scheme were not "official acts" because there is no evidence that these meetings involved any question, matter, cause, suit, proceeding or controversy which by law might have been brought before Muntain in his official capacity as Assistant to the Secretary for Labor Relations at HUD. It is undisputed that HUD has no responsibility for the development, administration, evaluation or promotion of group automobile insurance for labor unions. The Government, however, urges this Court to construe the scope of "official acts" to encompass any acts within the range of an official's public duties, broadly defined, including, in the instant case, any meeting between the Assistant to the Secretary for Labor Relations at HUD and labor union officials to discuss matters of interest to the unions. In essence, the Government would have this Court construe 18 U.S.C. § 201(g) as a statutory prohibition against the misuse of public office and contacts gained through that office to promote private ends.

To construe the statute in the manner advocated by the Government is we think, to extend its language beyond permissible bounds.[3] To the extent that defendant

---

**2.** 18 U.S.C. § 201(g) provides in pertinent part: "Whoever, being a public official . . . otherwise than as provided by law for the proper discharge of official duty, directly or indirectly asks, demands, exacts, solicits, seeks, accepts, receives, or agrees to receive anything of value for himself for or because of any official act performed or to be performed by him; . . . [s]hall be fined not more that $10,000 or imprisoned for not more than two years, or both."

**3.** The Government cites *United States v. Birdsall,* 233 U.S. 223, 34 S.Ct. 512, 58 L.Ed. 930 (1914), in support of its proposed broad reading

Muntain's use of his official position to promote a purely private venture created an appearance of impropriety, his conduct is reprehensible, but it is not criminal within the strictures of § 201(g). Section 201 of Title 18 is an anti-bribery statute aimed at preventing public officials from accepting anything of value in exchange for particular decisions or actions taken or to be taken by the public officials in their official capacity. The foundation of the Federal bribery statute has been described in the following terms:

"It is a major concern of organized society that the community have the benefit of objective evaluation and unbiased judgment on the part of those who participate in the making of official decisions. Therefore society deals sternly with bribery which would substitute the will of an interested person for the judgment of a public official as the controlling factor in official decision. The statute plainly proscribes such corrupt interference with the normal and proper func-

tioning of government." *United States v. Heffler,* 402 F.2d 924, 926 (3rd Cir. 1968), *cert. denied sub nom. Cecchini v. United States,* 394 U.S. 946, 89 S.Ct. 1280, 22 L.Ed.2d 480 (1969), quoting *United States v. Labovitz,* 251 F.2d 393, 394 (3rd Cir. 1958).

It is the corruption of official decisions through the misuse of influence in governmental decision-making which the bribery statute makes criminal.

In the instant case there was no evidence that Muntain's meetings with labor officials to discuss and promote group automobile insurance involved a subject which could be brought before Muntain—or, for that matter, anyone else at HUD—in an official capacity. There was, therefore, no apparent danger that the receipt of gratuities from Fleming or Cordial in connection with the group automobile insurance scheme would induce Muntain to act improperly in deciding a HUD-related matter. Accordingly, 18 U.S.C. § 201(g) simply does not apply.

---

of "official acts." In *Birdsall,* the Supreme Court stated that:

"Every action that is within the range of official duty comes within the purview of these sections [antecedents of § 201] . .. In numerous instances, duties not completely defined by written rules are clearly established by settled practice, and action taken in the course of their performance must be regarded as within the provisions of the . . statutes against bribery [now § 201]." 233 U.S. at 230–31, 34 S.Ct. at 514.

The quoted language establishes clearly that "official acts" are not to be limited to those duties set forth in a written job description but may include as well those duties customarily associated with a particular job. In the instant case, however, no evidence was introduced to suggest that the responsibilities of the Assistant to the Secretary for Labor Relations at HUD have been expanded by settled practice or otherwise to include meeting with labor union officials concerning group automobile insurance.

Recent opinions that have depended on an interpretation of "official act" have sustained convictions only where allegedly illegal payments were made for actions or decisions involving matters falling indisputably within the ambit of a public official's official duties. Thus, for example, in *United States v. Carson,* 464 F.2d 424 (2d Cir. 1972), a case upon which the Government relies heavily, the defendant

received money in return for approaching an official of the Justice Department in an effort to quash a pending action by that Department. At the time of his indictment, the defendant was the administrative assistant to Senator Fong, a member of the Senate Judiciary Committee, the activities of which affect directly the operation of the Justice Department. In *Carson* there was, moreover, testimony from the defendant himself that "as part of his job and under the applicable procedure that goes on at Capitol Hill, he, as an administrative assistant to Senator Fong, would exert influence on various agencies and branches of the Government . . .." 464 F.2d at 434. Based upon this explanation of the scope of defendant's duties, the Second Circuit found that defendant's attempt to influence the Justice Department fell within the ambit of his official duties. A similar approach has been used when defining "official acts" in *United States v. Evans,* 572 F.2d 455 (5th Cir. 1978) (HEW official with responsibilities for student loan program received payments from a private collection agency which had and sought contracts for the collection of delinquent loans); *United States v. Arroyo,* 581 F.2d 649 (7th Cir. 1978) (loan officer with Small Business Administration paid by applicant for SBA loan); and *United States v. Alessio,* 528 F.2d 1079 (9th Cir. 1976) (Administrator of Federal prison paid by son of prison inmate).

The Government's allegations concerning Muntain's efforts to encourage his subordinates at HUD to assist in promoting group automobile insurance may appear to present a closer case on first impression since there is no question that, in his official capacity, Muntain could and did direct subordinates at HUD in the performance of certain duties. There is also apparently no question that on at least two occasions Muntain directed his subordinates to assist Fleming and Cordial in promoting the insurance scheme with labor unions and that Muntain was reimbursed for his expenses in this regard. The crucial question under § 201(g), however, is whether in directing his subordinates to act, Muntain himself engaged in an "official act." Under the analysis applied above, the determinative factor is whether Muntain's actions involved a matter or issue that could properly, by law, be brought before him as Assistant to the Secretary for Labor Relations at HUD. Since the promotion of group automobile insurance was not such a matter, we conclude that no official act occurred and, hence, 18 U.S.C. § 201(g) cannot be invoked.

█ Under Count 3 of the indictment, Muntain was charged with violating 18 U.S.C. § 209 by having knowingly received $800 as "a contribution to, and a supplementation of, the salary he received from the United States Government as compensation for his services as the Assistant to the Secretary for Labor Relations . . . from a source other than the Government of the United States . . . ." The $800 was paid to Muntain by Fleming as reimbursement for expenses incurred in connection with the labor trip to Ireland taken by Muntain and his wife in May 1974 at the request of Fleming and Cordial.

Section 209 of Title 18 prohibits an officer or employee of the executive branch or an independent agency of the United States from receiving a salary, or any contribution to or supplementation of salary, from any source other than the United States as compensation for services as an employee of the United States.[4] In the instant case there can be no dispute that defendant, a high-ranking official in the executive branch, received a contribution from a source outside the Government when he accepted payment for the Ireland trip. For there to be a violation of § 209, however, the contribution must have been received as compensation for "services" and those services must have been "rendered as an employee of the United States." With respect to the first requirement, the $800 received by Muntain in connection with the Ireland trip was allegedly paid as reimbursement for the cost of the two airplane tickets used by Muntain and his wife. As such it might be argued that the $800 was reimbursement for "expenses" and not compensation for "services" within the meaning of § 209. Whatever merit this argument may have as to the $400 representing the cost of Muntain's own air fare, the Court does not believe that the $400 representing the cost of the ticket used by Mrs. Muntain can fairly be characterized as compensation for expenses incurred by defendant in the course of promoting the group automobile insurance plan. There was absolutely no evidence presented at trial that suggested that Mrs. Muntain's presence on the trip was in any way essential to the promotion of the automobile insurance scheme. Therefore, the jury could reasonably conclude that the cost of Mrs. Muntain's air fare constituted a reward or bonus paid to Muntain, above and beyond reimbursement for his own legitimate expenses, as compensation for services he had provided or was expected to provide in promoting the automobile insurance venture.

While it would be possible to satisfy the first requirement of § 209 by the reasoning just suggested, the second requirement presents an insurmountable obstacle to con-

---

4. 18 U.S.C. § 209 provides in pertinent part: "(a) Whoever receives any salary, or any contribution to or supplementation of salary, as compensation for his services as an officer or employee of the executive branch of the United States Government, . . . from any source other than the Government of the United States, . . . [s]hall be fined not more than $5000 or imprisoned not more than one year, or both."

viction in this case. The record on appeal indicates clearly, we think, that the payment to Muntain was for services having nothing to do with HUD business or with any responsibilities Muntain may have had to the Government as an employee of the United States.[5] Indeed, at the time of the trip, Muntain was on leave from his Government position. Since the payment of the cost of the Ireland trip bore no relation to governmental services, there can be no violation of 18 U.S.C. § 209.

■ Under Count 1 of the indictment Muntain was convicted of having conspired to defraud the United States and to violate 18 U.S.C. § 201(g).[6] In order to find a conspiracy, there must be evidence of an intent on the part of two or more persons to achieve the illegal object of the conspiracy. *See United States v. Feola*, 420 U.S. 671, 686, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975). In the instant case, conviction under either prong of the conspiracy count can be sustained only upon a finding of an intent to influence an official act. Section 201(g)

explicitly requires the receipt of something of value "for or because of any official act performed or to be performed." Under the other prong of Count 1, Muntain was charged with having conspired to deprive the United States of his faithful and unbiased "services, actions and performances of official acts and duties."

A review of the record in this case reveals no persuasive evidence of an intent on the part of any of the alleged conspirators either to interfere with Muntain's performance of the official services or acts required in connection with his position at HUD (first prong of the conspiracy count) or to have Muntain perform official acts in furtherance of the group automobile insurance scheme (second prong). Indeed, to the contrary, the evidence adduced at trial tends to establish affirmatively that the alleged conspirators believed any actions taken by Muntain in furtherance of the insurance scheme would be totally unrelated to his official duties at HUD.[7] Because none of

---

5. An Attorney General's Opinion dealing with 18 U.S.C. § 1914, the predecessor of § 209, defines the scope of the statute as follows:

"The statute clearly covers a salary received from a private person or source if it is paid or received as compensation or partial compensation for the *services rendered to the Government.* It has also been held to apply if the officer or employee renders the same or similar services to both the Government and a private person. . . . *It does not, however, prohibit payment for services rendered exclusively to private persons or organizations and which have no connection with the services rendered to the Government.* . . In view of the express language of the statute, its indicated scope and its obvious purpose to insure the impartiality of those who serve the Government, *it is clear that no violation of the statute arises from the mere coincidence of Government employment and the receipt of compensation from a private employer.*" (Emphasis added.) 41 *Op. Attorney General,* 217.220 (May 31, 1955).

18 U.S.C. § 1914 contained language almost identical to that of § 209. Where § 1914 prohibited the receipt of payments "in connection with" the performance of Government services, § 209 merely substitutes "as compensation for" for "in connection with." The purpose of this change was simply to clarify the statute's scope. *See Senate Report No. 2213,* 83rd Cong., 2d Sess., *reprinted in* 1962 U.S.C.C.A.N.

6. The general conspiracy statute, 18 U.S.C. § 371, under which Muntain was charged, provides in part:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both . . . ."

7. Cross-examination of Charles Cordial by defense counsel established that Cordial, and apparently Muntain as well, considered Muntain's participation in the automobile insurance plan to be entirely proper because unrelated to his duties at HUD:

Q. The question pending, Mr. Cordial, was you had an agreement oral, I take it—
A. Yes.
Q. —where you had a discussion with Mr. Muntain that he would endeavor to show you around and meet labor people, and in exchange for which he would get expenses, isn't that right?
A. That is correct.
Q. And I asked you if you thought that was improper.
A. No, I did not.
Q. You did not. As a matter of fact, you thought it was totally lawful, didn't you, sir?

the alleged conspirators contemplated that Muntain's participation in the insurance venture would either require or impinge upon official acts, the requisite intent necessary to sustain a finding of conspiracy is lacking and Muntain's conviction on Count 1 cannot stand.

■ The remaining two counts on which Muntain was convicted charged him with having violated 18 U.S.C. § 1001 [8] by knowingly concealing his involvement in the group automobile insurance venture when completing his 1974 and 1975 annual Confidential Statement of Employment and Financial Interests (HUD Form 844). HUD Form 844 requires employees of HUD to identify, *inter alia*:

"the names of all corporations, companies, firms, or other business enterprises, partnerships, nonprofit organizations and educational or other institutions: (a) with which you are connected as an employee, officer, owner, director, member, trustee, partner, adviser, or consultant."

A. Yes, I did.
Q. And from time to time, you discussed with Muntain his role with these things, didn't you, sir?
A. Yes.
Q. He told you repeatedly that as long as it didn't have anything to do with HUD, he saw no conflict of interest, didn't he? . . . Isn't that right?
A. That's right.
Q. And it didn't have anything to do with HUD?
A. That is correct.
(Transcript at 236–37).
Deryl Fleming's testimony reflected a similar evaluation:
Q. . . . In fact, this group auto plan had nothing to do with HUD either, did it?
A. No.
Q. Not as far as you are concerned, it had nothing to do with HUD. You were trying to sell it to private enterprise, weren't you?
A. Basically, yes.
Q. That's right. You weren't selling it to the government.
A. It could have extended to the government if I was able to sell it to the government employee unions, but that's not selling it to the government.
Q. And you weren't certainly trying to do that through Mr. Muntain?
A. No.
(Transcript at 436).

Count 4 of the indictment involved a statement filed in June 1974; Count 13 a statement filed in June 1975.

Defendant contends on appeal, as he did below, that his agreement with Fleming and Cordial to serve as a labor consultant for the mass marketing of group automobile insurance did not constitute an employment interest required to be disclosed on HUD Form 844 and that, even if it did, his failure to disclose was not willful. At trial, the Government introduced testimony of both Fleming and Cordial that, early in 1974, they entered into an oral "partnership" with Muntain involving the promotion and sale of group automobile insurance.[9] In September 1974 that oral agreement was reduced to writing.

Despite this testimony from Cordial and Fleming, Muntain asserts that there was in actuality no partnership agreement, but rather only an agreement to collaborate on a "venture" which might at some future time be transformed into a partnership or other business entity. Muntain emphasizes

**8.** 18 U.S.C. § 1001 provides in pertinent part:
"Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and wilfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations . . . shall be fined not more than $10,000 or imprisoned not more than five years, or both."

**9.** In response to a question concerning the nature of the oral agreement entered into in early 1974, Mr. Cordial testified that "the agreement between Mr. Muntain, myself and Mr. Fleming was that we were equal partners." (Transcript at 58). Similarly, Mr. Fleming's response when asked to characterize the "venture" that existed in June or July 1974 was "[a]ctive partnership, seeking business." (Transcript at 386).
That the basic nature of the arrangement did not change in September 1974 when the oral agreement was reduced to writing is indicated in the following exchange between counsel and Mr. Cordial:
"Q. Now, what was the nature of the agreement, Mr. Cordial, that you signed on the 12th day of September 1974?
A. The basic nature was that it stated in writing that we were equal partners . . .."
(Transcript at 195).

that the written memorandum which reduced to writing the original oral agreement refers to the possibility of forming a partnership in prospective terms. Further, the memorandum refers to "venturers," rather than partners, whose responsibilities are not set forth but are· "to be determined." [10] Muntain concludes that because the venture never "got off the ground" there was nothing for him to disclose on the HUD forms in 1974 and 1975.

As further support for the proposition that no partnership existed, Muntain points out that a partnership necessarily implies equal shares among the partners and, he asserts, the relationship he had with Fleming and Cordial was far from equal in 1974 and 1975. In this regard, Muntain relies on the fact that pursuant to an agreement which Cordial entered into in February 1974 with Group Marketing Consultants, Inc., and others, Cordial and Fleming were to receive consulting fees from GMCI for their efforts in mass marketing group automobile insurance to labor unions. By contrast, Muntain only received reimbursement for expenses during the relevant time period.

This latter argument is unpersuasive in arriving at a proper characterization of the business relationship that existed between Fleming, Cordial and Muntain. Muntain was not a party to the February 1974 agreement with GMCI under which Fleming and Cordial received consulting fees. The crucial agreement for purposes of our analysis is the oral agreement entered into the following month by Fleming, Cordial and defendant and later reduced to writing. Under the terms of this agreement, Fleming, Cordial and defendant were joined equally as labor consultants, each to receive payment of expenses and commissions from, *inter alia,* GMCI. Fleming and Cordial's

testimony concerning this agreement, moreover, seems to indicate that each of the three parties to the agreement considered their "venture" to be, from the outset, a partnership. As such, Muntain's employment interest in the venture should have been disclosed on the HUD form.

Even if no partnership existed in a technical sense, moreover, it seems obvious that Fleming, Cordial and Muntain were engaged in an active ongoing "business enterprise" which was subject to the disclosure requirement of HUD Form 844. In this regard Muntain's contention that no formalized partnership or corporate entity existed in 1974 or 1975 misses the mark. The language used in the HUD form suggests that its drafters intended to require disclosure by HUD employees of a broad spectrum of outside business and financial interests. The form refers to such specialized legal entities as partnerships and corporations, but it also refers more generally to "business enterprises," thereby presumably including within its sweep those business arrangements, in addition to partnerships and corporations, in which a HUD employee may have an established employment interest.

Finally, Muntain's contention that his failure to disclose was, in any event, not knowing or willful appears to us unconvincing. HUD Form 844 specifically requires the disclosure by HUD employees of their status as "partners" or "consultants." If Muntain entertained doubts as to whether the group automobile insurance plan qualified as a "business enterprise" or "partnership," prudence would have dictated that he disclose his involvement with the plan. His failure to do so, in light of the obvious intended breadth of the business entities to

---

10. Defendant relies particularly on paragraphs two and four of the memorandum.

Paragraph two states:
"The venture is to operate from time to time in such forms and through whatever entities (corporations, partnerships, joint ventures, etc.) as determined by venture. It is contemplated (but not essential to this venture) that this venture shall form a corporation. In that event, each of the parties hereto shall

own the outstanding stock of said corporation as follows . . . .."
Paragraph four states:
"Venturers agree to devote such time, attention, and business experience to the venture in whatever form operated as may be requested; the nature and extent of the duties to be determined from time to time by the parties with compensation to be mutually agreed upon."

be covered by the HUD form, appears to us sufficient to permit a jury to conclude that Muntain's actions were willful.

Based upon the foregoing analysis, we affirm as to Counts 4 and 13. As to Counts 1, 3, 5, 7, 9 and 11, we reverse and remand with instructions to enter a judgment of acquittal.