# Applicability of 18 U.S.C. § 209 to Acceptance by FBI Employees of Benefits Under the "Make a Dream Come True" Program

The criminal prohibition on supplementation of salary, 18 U.S.C. § 209, does not prohibit Federal Bureau of Investigation employees from receiving benefits under the Society of Former Special Agents of the FBI's "Make a Dream Come True" Program.

October 28, 1997

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
FEDERAL BUREAU OF INVESTIGATION

You have asked for our opinion whether the criminal prohibition on supplementation of salary, 18 U.S.C. § 209 (1994), forbids Federal Bureau of Investigation ("FBI") employees from receiving benefits under the "Make a Dream Come True Program" ("Program") sponsored by the Society of Former Special Agents of the FBI ("Society"). We understand that the Program is run by the Former Agents of the FBI Foundation ("Foundation"), an instrument of the Society that is exempt from taxes under the Internal Revenue Code, see 26 U.S.C. § 501(c)(3) (1994), and whose purpose is "to contribute generally to the public welfare through the alleviation of human suffering and the advancement of science, education and the cultural arts." [1] We further understand that the Program is designed to fulfill the wishes of terminally ill children or grandchildren of Society members or deceased Society members and the terminally ill children of any current, permanent FBI employees. To be eligible, a child must be between three and eighteen years of age and have a terminal condition certified by a doctor. For the reasons set forth below, we believe that § 209 does not prohibit current FBI employees from accepting benefits under the Program. [2]

## DISCUSSION

Section 209(a) of title 18 provides in pertinent part that "[w]hoever receives any salary, or any contribution to or supplementation of salary, as compensation for his services as an officer or employee of the executive branch of the United States Government . . . from any source other than the Government of the United States" shall be subject to the penalties set forth in § 216 of that title, i.e., impris-

---

[1] Memorandum for Mary Braden, Director, Departmental Ethics Office, from Patrick W Kelley, Acting Deputy Designated Agency Ethics Official at 1 (June 26, 1997) ("Kelley Memorandum") (internal quotations and citations omitted)

[2] Because § 209 prohibits, inter alia, the receipt of outside compensation for government services only by an "officer or employee of the executive branch," see 18 U S C § 209(a), we consider it necessary to address the receipt of benefits only by current FBI employees.

onment of up to one year for non-willful violations and/or a fine.[3] *See* 18 U.S.C. §§ 209(a), 216.

Section 209(a) has four elements. It prohibits: "(1) an officer or employee of the executive branch . . . of the United States Government from (2) receiving salary or any contribution to or supplementation of salary from (3) any source other than the United States (4) as compensation for services as an employee of the United States." *United States v. Raborn*, 575 F.2d 688, 691–92 (9th Cir. 1978). Benefits to employees under the Program likely satisfy the first three elements of § 209(a). *But see Crandon v. United States*, 494 U.S. 152, 168–69 (1990) (Scalia, J., concurring) ("Payments which are neither made periodically during the term of federal service[] nor calculated with reference to periodic compensation" do not qualify as salary or as a contribution to or supplementation of salary.). Thus, as has often been the case, the focus, for our purposes, is on the fourth element, i.e., whether a benefit given to an FBI employee under the Program is "compensation for services as an employee of the United States." *Raborn*, 575 F.2d at 692; *see* Memorandum for Fred F. Fielding, Counsel to the President, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel and J. Jackson Walter, Director, Office of Government Ethics, *Re: "Stand By Fund"—Applicability of Federal Law to Beneficiaries* at 3 (Feb. 2, 1982) ("Brady Fund Opinion"); OGE Informal Advisory Letter 85x19, 1985 WL 57318; OGE Informal Advisory Opinion 85x11, 1985 WL 57310.

To determine whether benefits given to FBI employees under the Program constitute compensation for government services, we must examine not only the language of § 209(a), but also the design of the statute as a whole and its purposes. *See Crandon*, 494 U.S. at 158. A literal reading of § 209(a) indicates that it prohibits payments from a private source to a government employee for that employee's government work, *see* The Association of the Bar of the City of New York, *Conflict of Interest and Federal Service* 55 (1960); Roswell B. Perkins, *The New Federal Conflict-of-Interest Law*, 76 Harv. L. Rev. 1113, 1137 (1963), but that reading does not answer the question of what is meant by "compensation for services." We thus turn to the legislative history and purposes of the statute, but note at the outset that "[b]ecause construction of a criminal statute must be guided by the need for fair warning, it is rare that legislative history or statutory policies will support a construction of a statute broader than that clearly warranted by the text." *Crandon*, 494 U.S. at 160.

In 1962 Congress amended the predecessor to § 209, which had prohibited payments "in connection with" an employee's services to the government, to prohibit payments "as compensation for" an employee's services to the government. The clarification responded to criticism founded on the vagueness and breadth of the reference to payments made "in connection with" the employee's services. *See*

---

[3] Paragraphs (b) through (f) of § 209 set forth several exemptions to § 209(a), none of which is directly relevant to the question you have asked

H.R. Rep. No. 87–748, at 13, 25 (1961) (amendment necessary because expression "in connection with" is imprecise and capable of an infinitely broad interpretation); S. Rep. No. 87–2213, at 14 (1962) ("The new language is more precise in expressing what is clearly intended by the present broad phrase."); *see also Crandon*, 494 U.S. at 161. According to the House Report on the amendment, the change was made "in order to emphasize the intent that the prohibition is against private payment *made expressly for* services rendered to the Government." H.R. Rep. No. 87–748, at 24–25 (emphasis added). The amendment was designed to clarify that there must be a "direct link" between the contribution to or supplementation of salary and the employee's services to the government. *See* Bayless Manning, *Federal Conflict of Interest Law* 171 (1964); *see also United States v. Muntain*, 610 F.2d 964, 969 (D.C. Cir. 1979) (violation of § 209 requires that "the contribution must have been received as compensation for 'services' "); OGE Informal Advisory Letter 81x31, 1981 WL 28075, at *1 ("[T]o make out an offense under section 209, it is essential to establish the linkage between the transfer of the thing of value and the services rendered.").

The question before us, therefore, is whether there is an intentional, direct link between a benefit given under the Program to a terminally ill child of an FBI employee and the FBI employee's services to the government. To ascertain the intent of the payor and/or the recipient, there are several factors that may be relevant, but no one of which is necessarily determinative, including, for example: (1) whether there is a substantial relationship or pattern of dealings between the agency and the payor; (2) whether the employee is in a position to influence the government on behalf of the payor; (3) whether the expressed intent of the payor is to compensate for government service; (4) whether circumstances indicate that the payment was motivated by a desire other than to compensate the employee for her government service, such as sympathy and respect or a familial relationship; (5) whether payments would also be made to non-government employees; and (6) whether payments would be distributed on a basis unrelated to government service, such as medical need. *See generally* Brady Fund Opinion;[4] *see also Private Compensation Paid to Member of the Turkey Industry Advisory Committee of the Department of Agriculture*, 41 Op. Att'y Gen. 217, 221 (1955).

---

[4] It could be argued that this opinion, which concluded that Mr. Brady could accept payments from a relief fund established specifically in response to the injuries he sustained in the course of the 1981 attempted assassination of then-President Reagan, has been called into question by the enactment of § 209(f). Section 209(f) expressly exempts from the prohibition of § 209(a) the "acceptance or receipt, by any officer or employee injured during the commission of an offense described in section 351 or 1751 of this title, of contributions or payments" from a non-profit, tax-exempt organization 18 U.S.C.A. § 209(f) (West Supp 1997) The cross-references are to sections of title 18 that protect high-level officials of the government, and the exception was passed specifically to cover contributions to and payments from a fund for James Brady. *See* 128 Cong Rec 6322–23, 6381–82 (1982) Although the legislative history indicates that certain Members of Congress believed that payments to Mr. Brady from the relief fund would have been prohibited absent the exemption, we need not decide whether the enactment of § 209(f) was precautionary or necessary. Whereas Mr Brady was injured in the course of his government service, the FBI employees eligible for the Program did not have their terminally ill children as part of their services to the government, nor are their children's terminal illnesses in any way related to the employees' service

All but one of these factors weigh against finding an intent to compensate for government services in this case. The Foundation has neither a substantial relationship with the FBI nor interests that may be substantially affected by its employees.[5] Because one of the Foundation's stated purposes is "to contribute generally to the public welfare through the alleviation of human suffering,"[6] and because the benefits are distributed only to those employees with terminally ill children, the benefits appear to be motivated by sympathy, rather than by a desire to compensate the employees for their government service. The only factor weighing on the other side is that, although the Program is open to the descendants of former government employees, the class of potential recipients is defined in part by their nexus to the FBI. *Cf.* Brady Fund Opinion (approving establishment of fund in large part because the beneficiaries of the fund would not be limited to federal employees).

The identity of eligible participants in the Program, by itself, is insufficient to make a benefit given under the Program "compensation for [the parent's] services" as an FBI employee. 18 U.S.C. § 209. First, the nexus between some of the eligible recipients and employment with the FBI is extremely attenuated. The Program extends even to the grandchildren of deceased former FBI agents. Moreover, the scope of the Program also demonstrates that it is motivated generally by sympathy for those who share a common bond rather than by an intent to supplement the salary of employees who may not be able to afford to grant the dreams of their terminally ill children.[7]

Second, nothing employees do in the course of their government service affects eligibility for the Program. Having a terminally ill child is an unpredictable and rare occurrence that has no connection to the performance of services for the government. *Cf.* OGE Informal Advisory Letter 93x21 (1993) (no violation of § 209(a) for legal defense fund to make payments to employee for legal expenses incurred during an administrative disciplinary proceeding brought against him by his agency because preparation of the employee's defense is not part of his govern-

---

[5] According to the available information, we understand that the extent of the FBI's relationship with the Foundation is limited to such matters as the inclusion of a flyer from the Society in retirement packages given to FBI employees, a brief presentation at the FBI employees' retirement seminar by a member of the Society, and a speech by the Director of the FBI at the Society's annual dinner. In addition, we understand that the primary source of the Foundation's funds is donations by members of the Society The Foundation is also funded by bequests from deceased members of the Society and donations from charities. Telephone conversations between Caroline Krass, Attorney-Advisor, Office of Legal Counsel, and Brian Smith, Assistant General Counsel, Administrative Law Unit, Office of the General Counsel, Federal Bureau of Investigation (Oct. 20–21, 1997) If this situation were to change and a significant portion of the Foundation's funds were to come from persons or entities whose interests could be substantially affected by the performance or nonperformance of the official duties of the eligible FBI employees, or were otherwise "prohibited source[s]" (*see* 5 C F R § 2635 203(d) (1997)), it would be important to examine more closely the possibility of an intent to compensate. *Cf* 41 Op. Att'y Gen at 221 ("An important factor in determining intent is whether the individual rendering service to the Government is in a position by virtue of his Government service to assist his private employer")

[6] Kelley Memorandum at 1 (internal quotations and citations omitted)

[7] We understand that the Program is not based on financial need. Telephone conversation between Caroline Krass, Attorney-Advisor, Office of Legal Counsel, and Brian Smith, Assistant General Counsel, Administrative Law Unit, Office of the General Counsel, Federal Bureau of Investigation (Oct 20, 1997).

ment work). In these respects, it is analogous to being struck by a natural disaster. *Cf.* Memorandum for All Department of Justice Employees, from William P. Barr, Attorney General, *Re: Hurricane Andrew Relief Fund* (Aug. 28, 1992) (soliciting funds from Department employees to provide financial assistance to those Department employees affected by Hurricane Andrew).

Nor do any of the purposes served by § 209(a) counsel in favor of prohibiting the acceptance of benefits given under the Program by current FBI employees. In *Crandon*, the only Supreme Court decision to address squarely the meaning of § 209(a), the Court pointed out that although § 209(a) is a prophylactic rule, "[i]t is nevertheless appropriate, in a case that raises questions about the scope of the prohibition, to identify the specific policies that the provision serves as well as those that counsel against reading it too broadly." 494 U.S. at 165. To summarize the policies implemented by § 209(a), the Court quoted extensively from a 1960 report prepared by the Special Committee on the Federal Conflict of Interest Laws of the Association of the Bar of the City of New York:

> The rule is really a special case of the general injunction against serving two masters. Three basic concerns underlie this rule prohibiting two payrolls and two paymasters for the same employee on the same job. First, the outside payor has a hold on the employee deriving from his ability to cut off one of the employee's economic lifelines. Second, the employee may tend to favor his outside payor even though no direct pressure is put on him to do so. And third, because of these real risks, the arrangement has a generally unwholesome appearance that breeds suspicion and bitterness among fellow employees and other observers.

494 U.S. at 165–66 (quoting The Association of the Bar of the City of New York, *Conflict of Interest and Federal Service* 211 (1960)); *see also Business Organizations Defraying Expenses of Agents of the Department of Commerce*, 33 Op. Att'y Gen. 273, 275 (1922) (object of predecessor to § 209(a) was that "no Government official or employee should serve two masters to the prejudice of his unbiased devotion to the interests of the United States").

None of the policy justifications for § 209(a)'s ban is implicated here. A one-time benefit based on an employee's having a terminally ill child would not give the Foundation an economic hold over the employee. Because neither the Foundation nor those who donate a significant portion of its funds has interests that could be affected by the employee,[8] the employee would not be in a position to favor the Foundation. Nor would it be reasonable for fellow employees and outside observers to feel bitter or suspicious about a Program that fulfills the dreams of terminally ill children. *Cf. Crandon*, 494 U.S. at 152 (endorsing a narrow reading

---

[8] *See supra* note 5.

of § 209(a) even where the interpretation potentially contravened one of the statute's three primary policy justifications).

Moreover, private payments to government employees because of their status as employees of the executive branch are not automatically intended as compensation for services to the government. Prohibiting all such payments would be inconsistent with the implicit exception for commemorative awards for public service recognized by this office. *See Gifts Received on Official Travel*, 8 Op. O.L.C. 143, 144 (1984) (''such awards are permissible primarily because the grantors are typically detached from and disinterested in the performance of the public official's duties''); OGE Informal Advisory Letter 83x11, 1983 WL 31714 (Department of Justice has consistently held that intent to compensate may not be inferred from the granting to a public official of a bona fide award for public service); *see also* 5 C.F.R. § 2635.204(d) (1997) (permitting employees to accept bona fide awards given for meritorious public service by a person who does not have interests that may be substantially affected by the performance or nonperformance of the employee's official duties). A public service award bears more resemblance to compensation for government services than does a benefit to an employee that is motivated in part by the employee's child's terminal illness and in part by the employee's status as an FBI employee.

Were we to conclude that § 209(a) prohibits all non-government payments to an individual where there is any nexus between the payment and the individual's employment by the government, we would effectively eviscerate § 2635.204(c)(2)(iii) of the Standards of Ethical Conduct for Employees of the Executive Branch (''Standards''). 5 C.F.R. § 2635.204(c)(2)(iii) (1997). Section 2635.204(c)(2)(iii) allows employees to accept ''[o]pportunities and benefits, including favorable rates and commercial discounts'' given because of an employee's official position when:

> [o]ffered by a person who is not a prohibited source to any group or class that is not defined in a manner that specifically discriminates among Government employees on the basis of type of official responsibility or on a basis that favors those of higher rank or rate of pay.

*Id.* Section 2635.204(c)(2)(iii), in relevant respects, reflects the administrative practice preceding the adoption of the Standards, which permitted the acceptance in certain circumstances of discounts offered to government employees as a class or to a more narrowly defined group of government employees. *See, e.g.*, OGE Informal Advisory Opinion 85x13, 1985 WL 57312; *accord* OGE Informal Advisory Letter 86x7; 1986 WL 69190; OGE Informal Advisory Letter 87x2, 1987 WL 109912.

We recognize that our reluctance to find that § 209(a) forbids all private payments to government employees that are motivated in part by the employees' government status may seem to be at odds with our earlier view that § 209 would prohibit the operation of a scholarship program for which only the children of living FBI employees would be eligible. *See* Memorandum for Joseph R. Davis, Assistant Director, Legal Counsel Division, Federal Bureau of Investigation, from Douglas W. Kmiec, Assistant Attorney General, Office of Legal Counsel, *Re: FBI Foundation* (Feb. 10, 1989) ("1989 Opinion"). The 1989 Opinion stated our belief that "a scholarship given . . . directly to an FBI employee to ease the burden of financing his or her child's education . . . constitutes a prohibited 'supplement' to the salary of an employee of the United States Government, if there is a nexus between the payment and the employee's federal employment." *Id.* at 8.

We continue to believe that § 209(a) would be violated if the circumstances indicate that the intent of a scholarship program (or any other program) is to supplement the employee's government salary. Because of the fact-intensive nature of analyzing whether a program is intended to compensate an employee for services to the government, however, we must resolve these difficult issues on a case-by-case basis. The 1989 Opinion may be read to suggest that any scholarship program limited to FBI employees would invariably violate § 209(a). Insofar as it can be so read, we think it unsound and reject it.

In sum, we conclude that § 209 does not prohibit eligible FBI employees from accepting benefits under the Program. To ensure that acceptance of the benefits does not violate the Standards of Conduct, we advise that you continue to consult with the Departmental Ethics Office and the Office of Government Ethics.

RICHARD L. SHIFFRIN
*Deputy Assistant Attorney General*
*Office of Legal Counsel*