Opinion for the Court filed by Senior Circuit Judge WILLIAMS.
Dissenting Opinion filed by Circuit Judge HENDERSON.
*425 STEPHEN F. WILLIAMS, Senior Circuit Judge.
An FBI informant working undercover gave cash to Nelson Valdes, then a detective with the D.C. Metropolitan Police Department (“MPD”), apparently as a reward for Valdes’s searching several police data bases to supply information. (Save for information about the non-existence of an arrest warrant for a fictitious person, the information was, according to uncontradicted testimony, publicly available. Joint Appendix (“J.A.”) 659-61, 663-64.) Valdes was convicted under 18 U.S.C. § 201(c)(1)(B) of three counts of receipt of illegal gratuities “for or because of an[ ] official act.” Valdes argues that the statute is far less sweeping than the government successfully claimed in district court, and that under a proper construction the government’s evidence was insufficient. He makes a number of other claims, including attacks on two related aspects of the jury instruction and an argument that he was entitled to acquittal as a matter of law on grounds of entrapment. We agree with Valdes that the district court’s interpretation of the statute was error and that the government failed to show that the acts for which Valdes received compensation were official acts within the meaning of § 201. We therefore reverse the conviction without reaching Valdes’s other claims.
* * * * * *
On the evening of February 17, 2001, William Blake, working as an undercover informant for the FBI, went on assignment to a Washington nightclub called “1223” (located at 1223 Connecticut Avenue, NW). At “1223” Blake was introduced to Valdes as a judge, and Valdes in turn identified himself as an MPD detective. The two met again at “1223” a week later, on which occasion Valdes gave Blake his business card with his cell phone number, saying it was “just in case [Blake] ever needed a favor.”
On March 17, an FBI agent instructed Blake to see if Valdes would provide him with police information. Accordingly, the FBI entered into state computer data bases the names of five fictitious individuals, along with fictitious addresses and license plate numbers. J.A. 361-A-B, 365-67, 371-72. That evening, again at “1223,” Blake asked Valdes if he could do him a “favor” of looking up the license plate numbers of some individuals that Blake said owed him money, presumably to track down their contact information. Valdes indicated that it would be “no problem” and told Blake to call him on his cell phone to get the information. On leaving, Blake handed Valdes a $50 bill; no testimony describes the accompanying conversation if any. Four days later, Blake called Valdes, introducing himself as “the judge,” reiterated his earlier request and provided Valdes with the first license plate number. Valdes then obtained the name and address of the license holder through a query to the Washington Area Law Enforcement System (“WALES”), a computer data base linked to state data bases. When Blake called back later, Valdes provided him with the name and address. After expressing satisfaction with the information, Blake asked Valdes, “How much [do] I owe you for this?” and Valdes responded, “Just a thank-you.”
Two days later, on March 23, Blake called Valdes again and asked him to run a second license plate query, which Valdes agreed to do. Blake proposed that they meet the next day in person; as Blake testified by way of explanation, a meeting would enable him to offer Valdes money: “I couldn’t push [money] through the phone.” The FBI equipped Blake for the meeting with a gold Rolex and Mercedes-Benz automobile with audio and video re *426 corders; it is unclear what the handlers’ purpose was in outfitting the phony judge with a Rolex and Mercedes. Blake and Valdes arranged to meet at a local gas station, where Blake paid Valdes $200 and asked him to run a third license plate. Valdes provided Blake with the names and addresses for the second and third plates that evening over the phone, again having obtained the information via WALES.
On March 30, Blake asked Valdes to run a fourth license plate. The two agreed to meet the next day at the same gas station; there, Blake paid Valdes $100 upon receiving the fourth name and address, again obtained via WALES. Blake also asked Valdes to check whether a friend of Blake’s “ha[d] a warrant,” handing Valdes an additional $100 to “give you a little more incentive.” Valdes again used WALES and that night told Blake that there was no warrant out on the person.
Valdes was indicted on three counts of bribery, in violation of 18 U.S.C. § 201(b)(2)(A) and (C). A jury convicted him of three counts of the lesser-included offense of receipt of an illegal gratuity, in violation of 18 U.S.C. § 201(c)(1)(B).
* fk sk * * *
We review the sufficiency of the evidence de novo, considering it in the light most favorable to the government, to determine whether any rational trier of fact could have found Valdes guilty beyond a reasonable doubt of all required elements of the crime. See United States v. Schaffer, 183 F.3d 833, 839-40 (D.C.Cir.1999).
The anti-gratuity statute provides that:
Whoever ... being a public official ... otherwise than as provided by law for the proper discharge of official duty, directly or indirectly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally for or because of any official act performed or to be performed by such official ... shall be fined under this title or imprisoned for not more than two years, or both.
18 U.S.C. § 201(c)(1)(B) (emphasis added). An “official act” is defined for these purposes as
any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official ....
18 U.S.C. § 201(a)(3). Unlike most of § 201’s anti-bribery provisions, the anti-gratuity provision has no requirement that the payment actually “influence[ ] ... the performance” of an official act. Compare, e.g., 18 U.S.C. § 201(b)(2)(A).
Valdes argues that logging onto the WALES system to retrieve public information does not constitute a “decision or action” and that there was no “question, matter, cause, suit, proceeding or controversy” regarding any of the individuals that was or could be pending before Valdes. He relies primarily on United States v. Muntain, 610 F.2d 964 (D.C.Cir.1979), where we found that the defendant Muntain, an Assistant to the Secretary for Labor Relations at the Department of Housing and Urban Development (“HUD”), had not accepted illegal gratuities for an official act when he was compensated by private persons for selling private auto insurance schemes to labor unions with whose leaders he also dealt on official HUD business. We rejected the government’s argument that official acts “encompass any acts within the range of an official’s public duties,” which the government argued included Muntain’s meetings with labor union officials. Id. at 967. As the promotion of group auto insurance was not a matter that “could be brought before Muntain — or, for that matter, anyone else at HUD — in an official capacity,” *427 there was no danger that the gratuities received could have induced Muntain “to act improperly in deciding a HUD-related matter.” Id. at 968.
The government tries to distinguish Muntain on the basis that it involved 'private auto insurance schemes, whereas (it argues) WALES queries inherently relate to the official duty of conducting police investigations. But the Muntain court plainly didn’t share the government’s present view of the public/private divide. Muntain used government resources in contacting possible labor union insurance purchasers, combining trips on government business with insurance promotion. Id. at 967-68. Further, besides conducting such meetings, Muntain had, as the government stressed in an alternative argument, wielded his supervisory authority to direct HUD subordinates to assist him in promoting insurance. Id. at 969. Thus Muntain deployed government resources (travel opportunities and workforce), just as did Valdes (the WALES database). But in Muntain we clearly rejected the idea that such a use of government resources was in itself an “official act” within the meaning of § 201(a)(3).
The government’s concept of “official act” is striking in its complete failure to address the statutory clause modifying “decision or action,” namely, “on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official.” The words are far from self-defining, but they suggest at least a rudimentary degree of formality, such as would be associated with a decision or action directly related to an adjudication, a license issuance (or withdrawal or modification), an investigation, a procurement, or a policy adoption. Easily included, of course, would be a clerk’s manufacture of official government approval of Supplemental Security Income benefits, as in United States v. Parker, 133 F.3d 322 (5th Cir.1998); compare Dissent, 437 F.3d at 1285 n.3, or an official’s “ignoring garbage violations and parking violations” he was charged with enforcing, compare Dissent, 437 F.3d at 1287. It is telling that the government’s brief, in purporting to quote the statute, actually omits all the objects of the preposition “on” except “matter” (using ellipses, to be sure). Appellee’s Br. at 35.
Yet in United States v. Sun-Diamond Growers, 526 U.S. 398, 406, 119 S.Ct. 1402, 143 L.Ed.2d 576 (1999), the Supreme Court relied on those words in rejecting the government’s claim that an official violated the statute in receiving benefits given simply because of his official position. The official’s mere “ability to favor the donor in executing the functions of his office” was not enough. Id. In reaching its holding the Court discussed several hypothetical gifts that it said would not fall under § 201(c)(1)(A) for want of any “official act,” including a replica sports jersey given to the President during a ceremonial White House visit, a school baseball cap given to the Secretary of Education during a visit to a school, and a complimentary lunch provided for the Secretary of Agriculture in connection with a speech to farmers. Id. at 406-07, 119 S.Ct. 1402. While hosting a ceremony, visiting a school, and delivering a speech “are assuredly ‘official acts’ in some sense,” they “are not ‘official acts’ within the meaning of the statute, which, as we have noted, defines ‘official act’ to mean ‘any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official.’ ” Id. at 407, 119 S.Ct. 1402. Thus the Court, in rejecting the above “absurdities,” id. at 408, 119 S.Ct. 1402, invoked the exact words jettisoned by the government here.
*428 Valdes’s WALES queries would appear to fit within the range of activities excluded from coverage by Sun-Diamond’s examples. All the officials’ acts (the WALES queries, ceremony, visit, or speech) have in common that none is a “decision or action” that directly affects any formal government decision made in fulfillment of government’s public responsibilities. Thus distortions of government execution of policy are (depending on one’s scheme of classification) either non-existent or entirely in the realm of casual and informal use of government resources. While one or more of Valdes’s disclosures may have been unethical, sanctionable, or even criminal independently of § 201, and while disclosure of an outstanding arrest warrant might have an indirect effect on its execution, none of these disclosures constituted a “decision or action on any question, matter [etc.]” in the usual sense of those words. Sun-Diamond mainly distinguished a “decision or action on any question [etc.]” from mere office-holding and its potential for later action; yet the case also suggests a distinction between a “decision or action on any question [etc.]” and the vast array of behavior that' Congress could have covered with some alien-compassing phrase such as “act or conduct related to the official’s work or in any way using government resources.”
We also put aside for obvious reasons the government’s straw man argument that the mere fact that persons were fictitious does not mean that “matters,” etc. could not be pending with respect to them. It points to United States v. Myers, 692 F.2d 823, 849-50 (2d Cir.1982), where the Second Circuit upheld conviction of a congressman for receiving bribes to introduce private immigration bills permitting fictitious sheiks to remain in the United States. But, assuming correctness of the decision, private immigration bills are “questions,” “matters,” and “proceedings” that a congressman could have “brought before” himself and fellow congressmen. Id. at 850. Here, by contrast, the informant plainly sought no change in the status of the FBI’s five fictional beings, with respect to whom not even a fictional “question, matter, cause, suit proceeding or controversy” was pending. Of course once there is a fictional person, a fictional “matter” might be ginned up. But a matter can likely be generated for every datum in every government data base. If, as the government implicitly contends, liability applies when no “matter,” etc. is either pending, or would be brought into existence “for or because” of the gratuity (as it would have been in Myers), or can otherwise in any plausible way “be brought” before the official, the analysis would sweep in any compensation for sharing any such datum.
The government makes two other arguments in support of its expansive reading of “official acts.” First, it argues that § 201(c)(1) itself contains a “safety valve,” as its language introducing subsections (A) and (B) contains the phrase “otherwise than as provided by law for the proper discharge of official duty.” See also § 201(c)(1)(B) (containing the same qualifying clause). At oral argument it suggested specifically that Sun-Diamond’s hypothetical of the Secretary of Education’s visit and receipt of a baseball cap would be “otherwise” authorized under regulations issued by the Office of Government Ethics (“OGE”), 5 CFR § 2635.204(a), as a gift below $20 and thereby excepted from § 201. See Oral Arg. Tape at 21:20. The OGE regulations, the government argues, further provide that a gift in accordance with the OGE regulations does not violate the anti-gratuity statute. 5 CFR § 2635.202(b). But the Sun-Diamond Court has already been there and done that. As Justice Scalia *429 noted, “We are unaware of any law empowering OGE to decriminalize acts prohibited by Title 18 of the United States Code.” 526 U.S. at 411, 119 S.Ct. 1402. Indeed, the Court indicated just the opposite, namely, that while gifts below $20 are excepted under the OGE regulations, they are not excepted under § 201, id. at 411-12, 119 S.Ct. 1402, and thus rejected the government’s claim that the “safe harbors [from OGE regulations] are, in general, incorporated into the enforcement of section 201.” See Reply Brief of the United States at 10, Sun-Diamond, 1999 WL 83925. Interestingly, the OGE regulations take away what they purport to give, saying that despite their terms an employee must not “[a]ccept a gift in return for being influenced in the performance of an official act.” 5 CFR § 2635.202(c)(1). Application of that provision would in many cases (depending on the relation between the regulation’s “influenced” and § 201’s “for or because of’) return us to the interpretive issue we started with and thus to the government’s sweeping notion of an “official act.”
More generally, Sun-Diamond went on to reason that anti-corruption law manifested a maze of precisely targeted prohibitions, and exceptions from more general prohibitions, so that “a statute in this field that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter.” 526 U.S. at 412, 119 S.Ct. 1402.
Finally, the government argues that United States v. Birdsall, 233 U.S. 223, 34 S.Ct. 512, 58 L.Ed. 930 (1914), controls. There the Court said, “Every action that is within the range of official duty comes within the purview of these sections.” Id. at 230, 34 S.Ct. 512. Whatever the language may mean, the government’s proposed broad reading was certainly not Birdsall’s holding. The Court was focused on rejecting the defendants’ theory on appeal — that for conduct to qualify as an “official act” it must be one “prescribed by statute,” id. at 231, 34 S.Ct. 512, as one of the decisions under review had held. See United States v. Birdsall, 206 F. 818, 821 (D.Iowa 1913); see also United States v. Van Wert, 195 F. 974, 977 (D.Iowa 1912) (arguably imposing an even more stringent test, saying that “unless the act ... is a violation of some act of Congress ... or of some departmental rule or regulation authorized by Congress ... no crime has been committed.”). So far as authority was concerned, the Court held, it was enough that the act — there an Interior Department or Bureau of Indian Affairs recommendation of clemency for persons charged with selling liquor to Indians— fulfilled “an established usage which constituted the common law of the department and fixed the duties of those engaged in its activities.” 233 U.S. at 231, 34 S.Ct. 512.
We find unconvincing the government’s argument that Congress endorsed its reading of Birdsall in the 1962 recodification of the statute. See S.Rep. No. 87-2213 (1962), reprinted in 1962 U.S.C.C.A.N. 3852. The Report merely notes in cursory fashion that the “term ‘official act’ is defined to include any decision or action taken by a public official in his capacity as such,” id. at 3856, and makes no mention of the words that the Sun-Diamond Court and we find crucial — the reference to a “question, matter, cause, suit, proceeding or controversy.” Sun^-Diamond and Muntain — both decided after the 1962 re-codification — clearly reject the notion that “every action within the range of official duty” automatically satisfies § 201’s definition. See 526 U.S. at 412, 119 S.Ct. 1402; 610 F.2d at 967 n.3
Because the government failed to show that the payments received by Valdes were *430 for any “decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official,” as required by 18 U.S.C. § 201, the judgment of conviction is

Reversed.