Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 7, 2005        Decided May 31, 2005
Reissued August 25, 2005

No. 03-3147

UNITED STATES OF AMERICA,
APPELLEE

v.

CHAKA TOURE HUTCHINSON,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 00cr00255-01)

———

*A.J. Kramer*, Federal Public Defender, argued the cause and filed the briefs for appellant. *William G. Spencer*, Assistant Federal Public Defender, entered an appearance.

*Suzanne C. Nyland*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Kenneth L. Wainstein*, U.S. Attorney, *John R. Fisher, Elizabeth Trosman,* and *Patricia A. Heffernan*, Assistant U.S. Attorneys.

Before: EDWARDS, ROGERS and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Chaka T. Hutchinson, who was walking to a friend's house after work, was stopped and questioned by two police officers and a detective who were investigating an assault that had occurred earlier in the evening. According to the police, Hutchinson very closely fit a lookout description for the assailant. As part of the investigative stop, the police asked for and received identification from Hutchinson and attempted to verify it through a computerized records check. The issue on appeal is whether the retention of his identification was related to the purpose of the stop or caused the stop to go on for too long, thereby making illegal his subsequent arrest and the search of his bag. *United States v. Hutchinson*, 268 F.3d 1117, 1123 (D.C. Cir. 2001) ("*Hutchinson I*"). We conclude, in light of the close match between the lookout description and Hutchinson's appearance, and the proximity in time and place between the assault and the investigative stop, which reasonably prompted concerns whether Hutchinson was the suspect for whom the police were looking, that the district court did not err in ruling that it was reasonable for the police to retain Hutchinson's proffered identification on site for two to five minutes in order to attempt to verify his identification through a computerized records check and allay the officers' reasonable articulable suspicion. Accordingly, because there was no Fourth Amendment violation, we affirm the judgment of conviction.

**I.**

This case was twice remanded to the district court to make findings of fact regarding the duration of the investigative stop, specifically "whether retention of Hutchinson's identification for the purpose of running the 'WALES' [Washington Area Law Enforcement System] check was related to the purpose of the

stop or caused the stop to go on for too long, thereby tainting the evidence and statements obtained by the police after the attempted 'WALES' check." *Hutchinson I*, 268 F.3d at 1123. In remanding the case a second time, the court stated that the district court was "free to consider new evidence and to make factual findings necessary to understand whether the information available from the 'WALES' system could have assisted the police in determining whether Hutchinson was the suspect whom they were pursuing." *United States v. Hutchinson*, No. 02-3038 (D.C. Cir. Nov. 27, 2002) (unpublished judgment). The court reviews the district court's determination of reasonableness under the Fourth Amendment to the United States Constitution *de novo*, and its findings of historical fact for clear error. *See Ornelas v. United States*, 517 U.S. 690, 699 (1996); *United States v. Christian*, 187 F.3d 663, 666 (D.C. Cir. 1999).

The relevant facts are as follows: Around midnight on July 27, 2000, the police broadcasted a "lookout" for a suspect to a stabbing that had occurred between 11:30 p.m. and 11:45 p.m. on 13th and Kenyon Streets, Northwest, Washington, D.C. An eyewitness, who saw the stabbing from an elevated position approximately fifty yards away, informed the police that the perpetrator was a Black male in his twenties, 5'6" to 5'9" tall, wearing dark clothes, with "a bush [hair style] which was pulled back with a tie in the back." Approximately an hour after the stabbing occurred, the police stopped Hutchinson at 13th and Monroe Streets, Northwest, approximately two to three blocks from the scene of the stabbing. The officers first saw Hutchinson walking east on Monroe Street, toward 13th Street, wearing dark blue pants and a white shirt, and carrying a shoulder bag; he was a Black male and had a bush hair style, pulled back and tied. Detective Hilliard was "very surprised that he . . . fit the lookout so closely," observing that "the bush pulled back into a tail was the very striking characteristic,"

although he appeared to be between 5'11" to 6' tall. *See Hutchinson I*, 268 F.3d at 1118. Hutchinson does not claim that the police lacked articulable suspicion to stop and question him. *Id.* at 1120.

Following a pat-down by one of the officers, during which nothing was found on Hutchinson, Detective Hilliard asked Hutchinson about his whereabouts, to which Hutchinson responded he had just left work and was on his way to a friend's house nearby, and for identification, which Hutchinson tendered. Hutchinson does not claim that his rights were infringed when the police asked for his identification, which he furnished without protest. *See id.*

At this point, Detective Hilliard went to his police cruiser to make notes on the identification and to run a computerized records check. On his way, Detective Hilliard asked Hutchinson if he would have a problem if he and Officer Diggs looked through his bag. Hutchinson did not respond. While Detective Hilliard "was comfortable that this wasn't our suspect," or "d[id]n't appear to be the guy that we're looking for," he also realized that Hutchinson could have taken off a dark shirt and put the weapon used in the stabbing in his bag. The Detective remained in his cruiser for two to five minutes, but was unable to use the "WALES" system. Returning to where Hutchinson and the two officers were standing, Detective Hilliard asked if Hutchinson had a problem with an officer looking in his bag. Again Hutchinson did not reply, but began to remove the bag from his shoulder. When Detective Hilliard asked Hutchinson what was wrong, Hutchinson replied, "Well, you [are] going to lock me up anyway." Detective Hilliard asked if he had a weapon in his bag, and Hutchinson said he had a gun.

On the second remand, the government introduced expert evidence on the computerized records system, known as

"WALES." "WALES" is a database maintained by the Metropolitan Police Department that allows the police to input local data and to communicate with other law enforcement agencies nationwide. It contains criminal history information regarding arrests, address information, physical description (race, sex, date of birth, height, weight, any scars or markings), police and correctional identification numbers, and warrant information. It also contains motor vehicle information (driver's licenses, vehicle registrations, vehicle identification numbers), social security numbers, aliases, fingerprint classifications, warnings about particular persons, and attempts to locate both missing cars and people. In addition, "WALES" interfaces with several other law enforcement records systems, including the National Law Enforcement Telecommunication System ("NLETS"), which allows an exchange of information between individual State databases and is maintained by the Federal Bureau of Investigation ("FBI"); the Criminal Justice Information System ("CJIS"), which contains arrest information from the police district or central cell (jail); and the National Crime Information Center ("NCIC"), which is maintained by the FBI. Thus, an officer calling in for a "WALES" check, using a given name, date of birth, or social security number would have the benefit of the computer search of multiple files in the system as a means of verifying information that has been provided. The officer would also receive information indicating whether the person is wanted by law enforcement authorities, the driver's license status, additional social security numbers or dates of birth, aliases, and any cautionary information. The search itself, from initiation of the name check to the dispatcher to a response from the dispatcher as a result of the "WALES" and NCIC inquiries, should "[o]rdinarily [take] no more than two to three minutes."

The district court concluded that the retention of Hutchinson's identification for the purpose of a "WALES"

check was related to the purpose of the stop and did not unnecessarily lengthen the investigative stop. Given the Detective's "persistent doubt" whether Hutchinson was the suspect for whom the police were looking, the district court found that the officer would want to record the identification information in a notebook for future reference. The district court further found that because the "WALES" check "would potentially help Detective Hilliard identify if [Hutchinson] were the stabbing suspect, by finding out if [he] was being truthful with the officers . . . the retention of [Hutchinson's] identification did not unnecessarily prolong the stop." Regarding the search of Hutchinson's bag, the district court concluded that "the short focused inquiry" was "reasonable under the circumstances," inasmuch as the Detective, although "comfortable that this guy d[id]n't appear to be the guy that we're looking for," could not be certain without determining if Hutchinson had a dark shirt in his bag.

## II.

As the prior remands made clear, the only question is whether it was reasonable for the police to retain Hutchinson's identification on site in order to attempt a "WALES" check and thereby prolong the *Terry* stop for an additional two to five minutes. *Hutchinson I*, 268 F.3d at 1123. During oral argument, counsel for the United States repeatedly stated it did not mean to suggest the police may run a "WALES" check during every *Terry* stop. We, too, reject any such suggestion, for the permissible scope and duration of a *Terry* stop necessarily varies with the circumstances in each case. *See, e.g.*, *United States v. Sharpe*, 470 U.S. 675, 686 (1985). When, measured in objective terms, an officer has good reason to doubt the identity of a pedestrian who is properly detained based on reasonable articulable suspicion of criminal activity, limited further investigation related to the stop may be warranted to verify the pedestrian's identification.

In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court upheld against a Fourth Amendment challenge a confrontation on the street between a citizen and the police. The Court observed that it "has always recognized":

> No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.

*Id.* at 9 (*quoting Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891)) (internal quotation marks omitted). Referencing "a sensitive area of police activity," *id.* at 9, involving "the power of the police to 'stop and frisk' . . . suspicious persons," *id.* at 10, and its precedent that "a search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope," *id.* at 18 (citations omitted), the Court in *Terry* observed "[t]he scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible," *id.* at 19 (citations omitted). Thus, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 499 (1983) (plurality opinion); *see also id.* at 510-11 (Brennan, J., concurring in the judgment); *see Berkemer v. McCarty*, 468 U.S. 420, 439-40 (1984); *United States v. Brignoni-Ponce*, 422 U.S. 873, 881-82 (1975); *cf. Michigan v. Summers*, 452 U.S. 692, 701 (1981). More recently, the Supreme Court in *Sharpe* advised that:

> In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during

which time it was necessary to detain the [suspect].

470 U.S. at 686.

Hutchinson's principal claim of error on appeal stems from the district court's rejection of his argument that information from "WALES" would have shed no light on whether he was the stabbing suspect, and thus retention of his identification was unrelated to the purpose of the stop. As he would have it, "[n]othing about the WALES evidence introduced at the second remand hearing has, or could have had, any bearing on whether [he] was hiding a dark shirt and/or knife in his bag." Br. for Appellant at 30. Nor, in his view, does "WALES" evidence bear on whether he was being truthful with the officers, because the government introduced no evidence relating to Hutchinson's proffered identification that could be tested for truthfulness. For the following reasons, we conclude Hutchinson's challenge to the extension of time for an investigative technique misses the mark. We hold that, taken together, the following three factors show that Hutchinson's Fourth Amendments rights were not violated.

First, the purpose of the attempted "WALES" check was closely tied to the Detective's uncertainty about whether Hutchinson was the stabbing suspect for whom the police were looking. As the district court found, "the value of a WALES check lies, at least in part, in its ability to indicate whether an individual is providing false information to police. This in turn could 'dispel suspicion,' or alternatively, suggest to the officers that they should investigate further." *See Sharpe*, 470 U.S. at 686. By confirming that Hutchinson either was or was not providing false identification information to the police, a "WALES" check ultimately could assist Detective Hilliard in evaluating whether or not Hutchinson was the stabbing suspect. The district court noted that Hutchinson "did not dispute expert

testimony that a WALES check could verify that the person is who they say they are." Regardless of the type of identification Hutchinson tendered, then, Hutchinson is in no position to argue now that a "WALES" check would be unhelpful to the police in resolving their uncertainty about whether he was the stabbing suspect. While he is correct that information from "WALES" would not tell the police whether he had a dark shirt in his bag, if he was being untruthful about his identification, the police would have reason not to take at face value his explanation of his whereabouts and to continue their investigation of him as the stabbing suspect. On the other hand, if his identity were confirmed, the police could "concentrate their efforts elsewhere," *Hiibel v. Sixth Judicial Dist. Court,* 124 S. Ct. 2451, 2458 (2004), and he could be on his way.

Second, the description of the assailant in the lookout closely matched Hutchinson's appearance, and he was stopped only two or three blocks from the scene of the crime, less than an hour after the stabbing. Notwithstanding the Detective's statement that he was pretty much satisfied that Hutchinson was not the stabbing suspect for whom they were looking, it was not unreasonable for the Detective to attempt to resolve his lingering uncertainty quickly through a "WALES" check to verify Hutchinson's identification. This uncertainty was reasonably prompted by the close match between Hutchinson's appearance and the lookout report, his proximity to the crime scene both temporally and geographically, and the Detective's concern that Hutchinson might have taken off a dark shirt.

Third, the stop was relatively brief, minimally intrusive*, see Sharpe*, 470 U.S. at 685, and was not prolonged for the purpose of making a generalized inquiry, such as whether there were outstanding warrants for the suspect, unrelated to the stop. The district court emphasized that "the entire stop was a very swift exercise between the time Detective Hilliard took [the tendered]

identification and the time [Hutchinson] indicated he had a weapon in his bag." The time taken to make notes on the tendered identification and to attempt a "WALES" check took between two to five minutes; the government's expert testified that a "WALES" check ordinarily would take no more than two to three minutes. The time taken for the "WALES" attempt occurred in the context of the Detective's uncertainty in view of Hutchinson's close match to the lookout. While it is true that before returning Hutchinson's identification, the Detective asked a second time whether Hutchinson would allow a search of his bag, Hutchinson began removing the bag from his shoulder, and after a few follow-up questions acknowledged that he had a gun in his bag. The Detective's inquiry at this point was hardly surprising given that he was unable to confirm the validity of Hutchinson's identification through "WALES" and still was uncertain whether Hutchinson was the lookout suspect and, more specifically about whether he might have a dark shirt or the weapon used in the stabbing in his bag; this uncertainty was heightened when Hutchinson did not respond for a second time to the request to search his bag.

Under the circumstances, the police acted diligently to dispel their reasonable articulable suspicions quickly through a "WALES" check and brief, focused questioning, *see Sharpe*, 470 U.S. at 686, and consequently the seizure of Hutchinson's identification "last[ed] no longer than [wa]s necessary to effectuate the purpose of the stop." *Royer*, 460 U.S. at 500 (plurality opinion); *see also id.* at 510-11 (Brennan, J., concurring in the judgment). Accordingly, because there was no Fourth Amendment violation, we affirm the judgment of conviction.