GARLAND, Circuit Judge,
with whom Circuit Judges SENTELLE, HENDERSON, RANDOLPH, and BROWN join, dissenting.
A guy walks into a bar. He meets a police detective, asks him to search a law-enforcement database for the names and home addresses of individuals holding certain Virginia automobile license plates, and then hands the detective some cash. He gives the detective more cash after the detective provides the information, and still more as an “incentive” to determine whether a “friend” of his has an outstanding arrest warrant in New York. The guy — who wears a gold Rolex, drives a leased Mercedes-Benz, will meet only at night at a local gas station, and advises the detective to “read between the lines” — • tells the detective that he is a “federal judge.” He says that he wants the information because “these f* * *ing people owe me a lot of money.”
The detective cannot know who .the “judge” really is, or why he wants the information. He cannot know whether the “judge” is a loan shark seeking to find and punish his debtors, or whether he wants the information because the individuals are his associates in a criminal enterprise, police officers who are surveilling him, witnesses against him, or targets of identity theft. The detective is wary: he uses another officer’s code to access the restricted database and then runs the license number of the “judge’s” own Mercedes, learning only that the Mercedes is leased. Nonetheless, in the end he takes the cash — repeatedly—and gives the “judge” the information he seeks.
For these acts, a jury convicted the detective of accepting an illegal gratuity — to put it bluntly, a “payoff.” Today, the court reverses the conviction on the ground that accepting such a gratuity does not constitute a crime. Because the court’s decision is wrong, and because it undermines the prosecution of public corruption, I respectfully dissent.
*1334 I
Both the facts and the law relevant to this case are straightforward.
A
The defendant is the aforementioned police officer, Metropolitan Police Department (MPD) detective Nelson Valdes. The “judge” is William Blake, an undercover informant for the FBI. After meeting Detective Valdes at a District of Columbia nightclub, Blake gave Valdes several Virginia license plate numbers and asked - him to find out the names and addresses of the holders of those plates. Blake told Valdes that he would “take care of’ [him],” and that Valdes could “make [himself] a few dollars.” Joint Exhibit Appendix (J.E.A.) 109, 111. Upon leaving the nightclub, Blake handed Valdes a $50 bill.
After taking the precautions noted in the introduction to this opinion, Valdes ran the license plate numbers through the Washington Area Law Enforcement System (WALES), a restricted police database that officers are authorized to use for law enforcement purposes only,[1] and that serves as an interface to the national law enforcement database known as the National Crime Information Center (NCIC).[2] Valdes told Blake that he would have to run the plates “one at a time,” because “they monitor this stuff.” J.E.A. 111. Valdes’ WALES searches produced the names, home addresses, and Social Security numbers of the license plate holders, all of which were fictions that the FBI had previously entered into the database in preparation for the undercover operation. Valdes gave the names and home addresses to Blake, who gave Valdes $200 on one occasion and $100 on another. Blake also asked Valdes to find out whether a “friend” had an outstanding arrest warrant in New York, giving him another $100 as “a little more incentive.” J.E.A. 121-22; Joint Appendix (J.A.) 281. NCIC indicated that there was no outstanding warrant for Blake’s “friend” — also a fiction — and Valdes so advised Blake. J.E.A. 127 (recording of Valdes informing Blake that, “[according to the NCIC check, nothing comes back”).
For the foregoing conduct, Valdes was charged with accepting a bribe in violation of 18 U.S.C. § 201(b)(2)(A). The jury ac *1335 quitted him of that charge, but convicted him of the lesser included offense of accepting an illegal gratuity in violation of 18 U.S.C. § 201(c)(1)(B). As the Supreme Court explained in United States v. Sun-Diamond Growers, the difference between bribery and gratuity is one of intent. See 526 U.S. 398, 404-05, 119 S.Ct. 1402, 143 L.Ed.2d 576 (1999). To be guilty of accepting a bribe, one must “corruptly” receive a payment “in return for ... being influenced in the performance of any official act.” 18 U.S.C. § 201(b)(2)(A). One can be guilty of accepting an illegal gratuity, however, simply for accepting a payment “for or because of’ the performance of an official act. Id. § 201(c)(1)(B). In other words,
for bribery there must be a quid pro quo — a specific intent to give or receive something of value in exchange for an official act. An illegal gratuity, on the other hand, may constitute merely a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken.
Sun-Diamond, 526 U.S. at 404-05, 119 S.Ct. 1402. It is from his conviction for accepting an unlawful gratuity that Valdes appeals.
B
The gratuity subsection of section 201 makes it a crime for a “public official” to “reeeiv[e]” or “accept[ ]” “anything of value personally for or because of any official act performed or to be performed by such official.” 18 U.S.C. § 201(c)(1)(B). There is no dispute that Valdes was a public official (statutorily defined as including employees of the District of Columbia, id. § 201(a)(1)), and that he personally accepted something of value ($450) for or because of the acts he took at Blake’s request. The only issue is whether those acts constituted “official act[s]” within the meaning of the statute.
Subsection 201(a)(3) defines “official act” — for purposes of both the gratuity and the bribery subsections — to mean “[1] any decision or aetion[, 2] on any question, matter, cause, suit, proceeding or controversy, which [3] may at any time be pending, or which may by law be brought before any public official, in such official’s official capacity, or in such official’s place of trust or profit.” Id. § 201(a)(3). Valdes’ conduct satisfies all three parts of the statutory definition. The following discussion outlines the essential points of the analysis; the areas of disagreement with the opinion of the court are discussed in succeeding Parts.
First, Valdes made a “decision” — or, even more clearly, took an “action.” He decided to and did initiate WALES checks of the license plate numbers Blake gave him. He did the same regarding the name Blake gave him for the purpose of conducting a warrant search.
Second, the action that Valdes took was on a “question [or] matter.” However vague those terms may be, there can be no dispute that a “matter” includes an “investigation.” See Oral Arg. Tr. at 70-71 (concession by Valdes’ counsel that a “matter” includes an “investigation”). Indeed, another section of the same chapter of the United States Code, which bars a former official from making appearances in connection with a “particular matter” in which the official had participated while in government, expressly defines “particular matter” as including “any investigation.” 18 U.S.C. § 207(f)(3); see also id. § 205(h) (defining a “covered matter” under another Code provision, § 205, as including an “investigation”).
Finally, an investigation is clearly a matter that “may at any time be pending, or [that] may by law be brought before” *1336 Valdes in his “official capacity [or] place of trust or profit.” Valdes was a police detective whose job, by definition, was to conduct investigations. Indeed, in the document that Valdes signed to gain access to WALES, he stated that he intended to use the database to “conduct criminal investigations and background checks'.” J.E.A. 83; see also J.E.A. 84. And as noted above, when Valdes used WALES, he was using a restricted database to which he had access only by virtue of his status as a police officer.
Much of this is common ground, although the court reaches its conclusions by a different route. According to the court, “the words ‘question’ and ‘matter’ are known by the company that they keep,” Court Op. at 1323-24, and hence those more general terms must be interpreted to reflect the same “class of processes” as the other terms in the six-term series listed in the definition of official act, id. at 1325. There is a reasonable argument that the series was instead intended to broaden the statutory definition, rather than to limit it. See United States v. Valdes, 437 F.3d 1276, 1284-85 (D.C.Cir.2006) (Henderson, J., dissenting). But in any event, the court concedes that “a police investigation is in the same class of processes as a ‘question, matter, cause, suit, proceeding, or controversy.’ ” Court Op. at 1325-26. Thus, even on the court’s view of the appropriate approach to interpreting subsection 201(a)(3), an investigation constitutes an “official act.” See id. at 1325.
The court further insists that the “six-term series refers to a class of questions or matters whose answer or disposition is determined by the government.” Id. at 1324. I am not certain what work this formulation performs beyond that already accomplished by the express requirement of subsection 201(a)(3) that the question or matter must be one that “may at any time be pending, or [that] may by law be brought before any public official, in such official’s official capacity.” But even accepting the court’s formulation, there is still no dispute as to the conclusion. As the court states: “ ‘Should the police investigate this person?’ ... is clearly a question answered by the government.” Court Op. at 1326. And “[providing or receiving gifts for, or because of, decisions to initiate, accelerate, retard, conclude, or skew [a police] investigation is unquestionably conduct prohibited by § 201.” Id. at 1326.
Having identified common ground, the next Part addresses the field of disagreement: whether there was sufficient evidence for a jury to find that Valdes’ actions amounted to an investigation and therefore an official act.
II
Although the court and I agree that an investigation is an “official act” within the meaning of subsection 201(a)(3), the court holds that Valdes’ conduct cannot — as a matter of law — constitute an investigation. That holding is untenable.
A
Viewing the “evidence in the light most favorable to the government” as we must, United States v. Alexander, 331 F.3d 116, 127 (D.C.Cir.2003) (internal quotation marks omitted), the actions that Detective Valdes took in this case are the routine steps that police officers take in a wide variety of investigations. Running license plate numbers and checking for outstanding warrants provide important information about both suspects and witnesses, often helping the police to separate one from the other. That is why Valdes sought access to WALES in the first place — to “conduct criminal investigations and background checks.” J.E.A. 83. Indeed, the case law of the District of Co *1337 lumbia is replete with references to the use of WALES for these and other investigative purposes.[3]
1. The court dismisses the acts taken by Valdes as the “ascertainment of answers” to a few questions, Court Op. at 1326, and as “simple interrogative activity,” id. at 1328. But many police investigations are quite brief. A WALES search may take only a few minutes, yet in that interval it can eliminate a suspect or confirm that he is a fugitive.[4] Some investigations begin and end with a single step: the running of tags. That step may tell a traffic officer that the person he has stopped is wanted for a crime,[5] or that he is just a minister on his way to church. The brevity of an inquiry, and the limited number of steps required to achieve its object, cannot alone be enough — certainly not as a matter of law — to rule it out as an investigation covered by the statute.[6]
This analysis neither “disaggregate^]” nor “generalized” the steps taken in an investigation, nor does it require holding that “every question asked and answered” is an “action” on a “matter.” Court Op. at 1326. If Valdes had been ordered by a superior officer to make the WALES inquiries he did, no one would doubt that he was conducting an “investigation.” But if Valdes’ conduct would constitute an official act under those circumstances, then the fact that he acted in response to an outsider’s request rather than an instruction from a supervisor cannot save him: “official act” is defined in terms of a “decision or action,” regardless of who requests it, and the statute only requires that the “decision or action” be on a “question [or] matter” that “may at any time be pending, or [that] may by law be brought before” him in his official capacity. 18 U.S.C. § 201(a)(3) (emphasis added). Moreover, no one — neither the defendant nor the court — disputes that an officer would be liable under section 201 if he accepted money as a reward for not running a WALES search on a driver’s license during a traffic stop. See Oral Arg. Tr. at 12-13; Court Op. at 1325-26.[7]
The court suggests that another flaw in the government’s case is that Valdes’ investigation did not involve “activity in the real world,” that it was “imaginary,” and that it was “a pure fiction.” Court Op. at 1326, 1328. In one sense that is, of course, true. The case involved an undercover *1338 “sting” operation in which each of the players — other than the defendant — was indeed fictitious. But such operations are a staple of bribery prosecutions,[8] and the court takes pains to assure us that its decision will have “no effect on law enforcement’s ability to conduct ‘sting’ operations,” and that the fact that the case involved a sting is irrelevant to its analysis. Court Op. at 1326.
Once the fact that the case involved a sting is removed from the equation, however, it is unclear what the court means when it says that “Valdes’s queries belonged to no ... active or incipient police investigation,” id. at 1326, that they did not amount to “some sort of government investigation,” id., and that the issue was “linked only by pure supposition to an imaginary future matter,” id. at 1329. The court does not attempt to define what would constitute an “investigation,” saying only that the matter must be “at least nascent” and “the underlying issue [must have] surfaced to some degree.” Id. at 1328. But the matter before Valdes was more than nascent and had already surfaced. His conduct was not linked to an “imaginary future” investigation; it was itself an actual investigation. Valdes conducted a background investigation on five individuals. This was a matter that Blake actually “brought before” Valdes, that was “pending” before him in the present, and upon which he “act[ed]” in the present tense. 18 U.S.C. § 201(a)(3). With respect, it is the court and not the dissent that does “not define the outer bounds of [its] theory.” Court Op. at 1326; see id. at 1329 (“Exactly how developed an issue must be before it qualifies as possibly pending or able to be brought by law is something we need not decide.”).
In a related vein, the court argues that “the scenario presented to Valdes gave neither him, nor any other police officer, any reason for official investigation of the individuals for whom Blake sought license number or warrant information.” Id. at 1329. But once the sting is removed from the scenario, it is clear that the reason there was no “reason” is that Valdes would not have investigated the license number holders but for Blake’s unlawful request. Removing such a case from the definition of “official act,” however, strikes at the core of bribery prosecutions under subsection 201(b)(2)(A), which punishes public officials who take official acts that they would have no reason to take but for being influenced by the payment of a bribe. If the court’s argument were correct, successful bribery prosecutions under that provision — which depend upon the same definition of “official act” as gratuity prosecutions — would not be possible.
2. Nor is there any doubt that the investigation undertaken by Valdes was a police investigation — that is, an investigation undertaken by Valdes in his “official capacity.” 18 U.S.C. § 201(a)(3). At one point in its opinion, the court alludes to the practice of “moonlighting,” see Court Op. at 1324, a word of multiple connotations, not all of which are benign.[9] But Valdes did not undertake his efforts for Blake *1339 outside the scope of his official employment. He did not merely “parallel[ ]” his “regular work,” Court Op. at 1326, by running down license plates and warrants during his off hours, traveling to multiple motor vehicles departments or courthouses to learn the information as a member of the general public would have to do. Instead, he conducted the searches on his police computer by accessing WALES, a database that he knew full well could be used only for official business. See J.E.A. 87 (Valdes’ personal acknowledgment, on a WALES training questionnaire, that the “[u]se of the WALES and NCIC systems is for criminal Justice purpose[s],” and that “[i]mproper use or dissemination of information contained within these systems could result in,” inter alia, criminal prosecution); J.E.A. 111 (recording of Valdes telling Blake that he could only run one search at a time “ ‘cause they monitor this stuff’); sources cited supra note 1 (regulations restricting WALES to “official legitimate law enforcement purposes only” and warning MPD employees to “take extraordinary precautions to ensure that this information is not observable to unauthorized persons”). Indeed, a tape of a telephone call makes clear that Valdes spoke to Blake from the police department, while he was in the process of entering the license plate numbers into the computer (the clicks are audible). J.E.A. 127.
Moreover, the steps taken by Detective Valdes are not only the kinds of investigative steps that police officers legally take; they are also the kinds of investigations that criminals have paid police officers to take for their own illegal purposes. A drug crew may want to know, for example, whether cars that cruise its neighborhood belong to rival gang members — or to undercover officers.[10] Its leaders may want to learn the home addresses or identities of witnesses who could testify against them at a trial or before a grand jury.[11] They may want to know whether they or their associates have outstanding warrants.[12] And a gang interested in identity theft may simply want the names,’ addresses, Social Security numbers, and other personal identifiers that WALES and similar law enforcement databases hold. See supra note 2 (listing personal data contained in WALES and associated databases). Although it turns out that none of these were the motives of the “judge” in this case, Valdes could not have known that. And in any event, the corruptness of the payor’s or payee’s motive is not an element of the gratuity offense. See Sun-Diamond, 526 U.S. at 404-05, 119 S.Ct. 1402.
3. Finally, I note the defendant’s argument that his WALES searches cannot constitute an investigation because they yielded only publicly available information. The court does not adopt that argument, and rightly so. The argument fails for three reasons.
First, nothing in the statutory language requires that an “official act” involve information that is not otherwise publicly available. And, in fact, many police investigations involve what might be called “public source” information: the observation of cars on public streets, the surveillance of suspects in public places, the inspection of trash cans at the curb, and the questioning of neighbors and other witnesses. Al *1340 though all these things can be done by private investigators, they are within the scope of section 201 when done by the police.
Second, it is not at all certain that the information Blake gave Valdes was publicly available. Although Valdes contends that a private investigator could have obtained the home addresses of the license plate holders by going to Virginia’s Department of Motor Vehicles, a federal statute suggests otherwise. See 18 U.S.C. § 2721 (limiting disclosure of personal information, such as drivers’ addresses, contained in state motor vehicle records).[13]
Third, the information that Valdes disclosed was in fact “confidential” in a much more important sense. Valdes did not just advise Blake of the home addresses and warrant status of certain individuals: he told him what the government’s files held on those subjects. See, e.g., J.E.A. 127 (recording of Valdes notifying Blake that, “[a]ccording to the NCIC check, nothing comes back” with respect to the outstanding warrant (emphasis added)). That information is not available to an ordinary citizen or private investigator because WALES is accessible only to law enforcement officers on official business. See sources cited supra note 1. And knowing what the government’s files say has a value of its own, beyond the mere efficiency of information acquisition. When a police officer stops a car in the District of Columbia, he can check the driver’s status by accessing WALES; he cannot, however, drive down to Virginia or up to New York to check public records. For $450, Blake learned not just whether his “friend” had a warrant, but whether WALES would show that he had a warrant. Had Blake been a drug dealer in the District, this would have been uniquely valuable information: knowing that WALES did not show his “friend” was wanted would make that friend a better bet as a drug courier, since he would be less likely to be arrested and searched after a traffic stop.
In sum, there is no ground for excluding Valdes’ investigation from the scope of the gratuity offense.
B
The court asserts that two precedents compel its conclusion that Valdes’ conduct falls outside the coverage of subsection 201(c). Neither, however, supports that result.
1. In United States v. Swrir-Diamond Growers, the Supreme Court reversed a trade association’s conviction under subsection 201(c)(1)(A) for giving Agriculture Secretary Michael Espy illegal gratuities (including sports tickets, luggage, and meals). The trial judge had charged the jury that it could find the association guilty if it “provided Espy with unauthorized compensation simply because he held public office,” and that,the “government need not prove that the alleged gratuity was linked to a specific or identifiable official act or any act at all.” 526 U.S. at 403, 119 S.Ct. 1402. The Court held that the statutory phrase, “for or because of any official act performed or to be performed,” means “for or because of some particular official act” and not “for or because of official acts in general.” Id. at 406, 119 S.Ct. 1402. Were that not the case, the Court said, the *1341 statute “would criminalize, for example, token gifts” given to officials “based on [their] official position[s] and not linked to any identifiable act.” Id. at 406-07, 119 S.Ct. 1402. These could include, the Court suggested, a sports jersey given to the President by an athletic team during a White House visit, a school cap given to the Education Secretary on the occasion of his visit to a high school, or a complimentary lunch for the Agriculture Secretary in conjunction with his speech to a group of farmers. Id. Requiring the government to prove an identifiable act, the Court said, would prevent such results.
In dictum, the Sun-Diamond Court worried that an “identifiable act” requirement might still not wholly solve the problem, because such gifts could “be regarded as having been conferred, not only because of the official’s position as President or Secretary,” but also “for or because of’ the official acts of receiving the sports team, visiting the high school, or speaking to the farmers. Id. at 407, 119 S.Ct. 1402. “The answer to this objection,” the Court said, is that those actions “are not ‘official acts’ within the meaning of the statute,” which “defines ‘official act’ to mean ‘any decision or action on any question, matter, cause suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any official, in such official’s official capacity, or in such official’s place of trust or profit.’ ” Id. (quoting 18 U.S.C. § 201(a)(3)).
Nothing in either Sun-Diamond’s holding (that an illegal gratuity conviction requires a connection between the gratuity and an identifiable act) or its dictum (that activities such as receiving a sports team, visiting a high school, or speaking to farmers do not constitute “official acts” within the meaning of the statute) precludes our finding sufficient evidence to support Valdes’ conviction. There is certainly “music” in Sun-Diamond that reflects a desire to rein in the broad language of section 201 (though there is contrapuntal music in United States v. Birdsall, 233 U.S. 223, 230, 34 S.Ct. 512, 58 L.Ed. 930 (1914), as Judge Henderson has pointed out, see Valdes, 437 F.3d at 1284, 1287 n. 10 (Henderson, J., dissenting)). The Supreme Court’s preference for interpreting the statute as a “scalpel” rather than a “meat axe,” cited in this court’s opinion in the instant case, is one such melody. Sun-Diamond, 526 U.S. at 412, 119 S.Ct. 1402, quoted in Court Op. at 1323. But Sun-Diamond did not suggest that such narrowing should be accomplished arbitrarily. Rather, as the Supreme Court said expressly, the way to appropriately accomplish that end is to require that the official’s action fall within the statutory definition of “official act.” “[W]hen the violation is linked to a particular ‘official act,’ ” the Court said, “it is possible to eliminate the absurdities through the definition of that term.” 526 U.S. at 408, 119 S.Ct. 1402 (emphasis in original).
Wfiiile it may be absurd to describe receiving a sports team or visiting a high school as an official act, there is no dispute that a police investigation can fairly be described in that way. Because the initiation of such an investigation is a “decision or action” on a “question [or] matter” that may “be pending, or ... by law be brought before” a police detective in his “official capacity,” the statutory “definition of th[e] term” “official act” eliminates any argument that Valdes’ conduct falls outside the scope of section 201(c). Hence, affirming his conviction would be faithful to both the words and the music of the Sun-Diamond opinion.
2. The other precedent cited by the court is our own decision in United States v. Muntain, 610 F.2d 964 (D.C.Cir.1979). The defendant in that case was a Depart *1342 ment of Housing and Urban Development (HUD) official, who was convicted of accepting illegal gratuities for assisting his alleged co-conspirators in marketing private automobile insurance to labor unions. That assistance involved both Muntain’s personal acts and his efforts to get his HUD subordinates to help him. As the court explained in reversing Muntain’s conviction, the problem with the government’s case was the absence of evidence suggesting “that automobile insurance as a benefit for labor unions fell within HUD’s jurisdiction.” Id. at 966. Because “pro-mot[ing] group automobile insurance” did not “involv[e] a subject which could be brought before Muntain or, for that matter, anyone else at HUD in an official capacity, [there was] no apparent danger that the receipt of gratuities ... in connection with the group automobile insurance scheme would induce Muntain to act improperly in deciding a HUD-related matter.” Id. at 968. The “determinative factor,” we held, was “whether Muntain’s actions” — both personally and in directing his subordinates — “involved a matter or issue that could properly, by law, be brought before him as an Assistant to the Secretary” of HUD. Id. at 969. “Since the promotion of group automobile insurance was not such a matter,” we concluded “that no official act occurred and, hence, 18 U.S.C. § 201[ (c) ] cannot be invoked.” Id.
Muntain reflects an important statutory limitation on the scope of the gratuity provision: the action at issue must involve a question or matter “which may at any time be pending, or which may by law be brought before” the defendant in his “official capacity.” 18 U.S.C. § 201(a)(3). That limitation is satisfied here. Valdes was a police detective, and the kind of matter involved in this case — a police investigation — unquestionably could have been pending or brought before him in his official capacity. Accordingly, neither Muntain nor any other case supports the result that the court reaches today.
III
My conclusion that there was sufficient evidence for a reasonable jury to find that Valdes’ conduct constituted an investigation, and hence an official act, is sufficient to end my analysis of this issue. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (holding that evidence is sufficient to sustain a verdict if “any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt”).[14] The court, by contrast, must go further. Because it concludes that Valdes’ conduct did not constitute an investigation, it must go on to consider whether that conduct — viewed simply as an information disclosure — nonetheless falls within the compass of “official act.” Although I do not need to decide that question, I am compelled to address troubling aspects of the court’s analysis.
A
According to the court, “[e]xcept in limited circumstances” like those involving formal procedures established by the Freedom of Information Act (FOIA), “we do not believe that a release of information can constitute a ‘decision or action on any question, matter, cause, suit, proceeding, or controversy.’ ” Court Op. at 1329 (quoting 18 U.S.C. § 201(a)(3)); see id. at 1329-30.[15] Hence, under the court’s inter *1343 pretation, if a drug dealer were to reward Valdes for providing him with the names, home addresses, and Social Security numbers of government witnesses, taking (or giving) the money would not constitute an unlawful gratuity — unless the dealer also filed a FOIA request. The same would be true if an identity thief (or a commercial enterprise seeking to augment its customer list[16]) paid Valdes for providing such information. The same would be true if Valdes were paid for running DNA or fingerprint checks. And the same would be true if a drug company, rather than a drug dealer, rewarded an FDA scientist for disclosing confidential information about the agency’s plans for approving the company’s drugs.
The court consoles us with the possibility that, under such circumstances, Valdes’ information disclosure might violate one of an array of specific non-disclosure statutes. (It would not, however, violate the drug laws if Valdes did not know why the drug dealer wanted the information.) In fact, it is not at all clear that any of the criminal statutes cited by the court, see Court Op. at 1324-25, 1329-30, would apply to Valdes’ situation; and it is extremely doubtful that any would apply to the private citizen who paid him the money. But even if a non-disclosure statute did apply, the court correctly concedes that the possibility that Valdes violated another statute “implies nothing direct about his culpability under § 201.” Id. at 1325. Congress may well — and often does — proscribe the same conduct in multiple statutes. See United States v. Williams, 216 F.3d 1099, 1102 (D.C.Cir.2000) (“It is not uncommon for laws to be cumulative.”). And it would be neither troubling nor surprising if section 201 punished the disclosure of information for pay more severely than other laws punished the mere disclosure alone. Disclosing information for pay adds a level of venality that the legislature is certainly warranted in punishing with greater severity.
The court also consoles us with the possibility that, if Valdes took money offered to induce him to provide confidential information, that “might qualify as [an act] ‘in violation of the official duty’ ” of a public official. Court Op. at 1329. If it did so qualify, Valdes’ conduct might violate a different subsection of the bribery statute, subsection 201(b)(2)(C), which punishes a public official for corruptly accepting payment in return for “being induced to do ... any act in violation of [his] official duty.” That possibility is not much consolation.
First, this circuit has never had occasion to' construe the meaning of “official duty” under subsection 201(b)(2)(C), let alone to explain how it differs from the meaning of “official act” ' under subsection 201(b)(2)(A).[17] Nor are the varying explanations offered by other circuits particu *1344 larly helpful.[18] The court thus holds out the possibility of a bribery prosecution under a subsection of uncertain meaning, while eliminating the possibility of such a prosecution under subsection 201(b)(2)(A).[19] The court’s analysis eliminates the latter possibility because, if it is not a gratuity in violation of subsection 201(c)(1)(B) for Valdes to accept money from a drug dealer “for or because” he conducted the WALES searches, it cannot be bribery in violation of subsection 201(b)(2)(A) even if that money “influence[s]” him to conduct those searches. That is so because both subsections 201(c)(1)(B) and (b)(2)(A) require an “official act,” and because both rely on the same definition of that term. See 18 U.S.C. § 201(a)(3). Indeed, on the court’s analysis, it cannot even be bribery under section 201(b)(1)(A) for the drug dealer to pay to influence the detective to conduct such searches.
Second, the principal problem with the court’s decision is not that it will permit criminals to bribe our public officials, but that it will permit them to reward those officials. Even if the “official duty” subsection of the bribery statute (§ 201(b)(2)(C)) does apply to a payment intended to induce, disclosure of confidential government information, that subsection (unlike § 201(b)(2)(A)) has no parallel in the gratuities subsection (§ 201(c)(1)). Hence, if a public official is paid cash as an after-the-fact “reward” — not as an “inducement” — for disclosing confidential information, the payment is not unlawful under the court’s analysis. See Sun-Diamond, 526 U.S. at 404-05, 119 S.Ct. 1402 (explaining that “for bribery there must be a quid pro quo,” while an “illegal gratuity ... may constitute merely a reward for some future act ... or for a past act that [the official] has already taken”). That is true for all of the “rewards” described above— ranging from one'paid to a detective by an identity thief or drug dealer, to one paid to an FDA scientist by a drug company.
Although the court is correct in noting that the bribery provision covers more “predicate acts” than the gratuity provision, it has no warrant for concluding that applying the latter to Valdes’ conduct would disturb a “kind of balance” chosen by Congress. Court Op. at 1327; see id. at 1327-28. There is certainly nothing in the legislative history to suggest that Congress intended the gratuity predicate to be so narrow as to exclude conduct like that of Valdes, or like that of the identity thief, drug dealer, or drug company noted above. Although the court is correct in saying *1345 that it “is the corruption of official decisions through the misuse of influence in governmental decision-making which the bribery statute makes criminal,” id. at 1324 (quoting Muntain, 610 F.2d at 968 (emphasis added)), the gratuity provision reaches further to prevent the creeping corruption that may arise as the result of giving or receiving rewards for official acts. As the House Report accompanying the passage of the current statute explained, the “conduct which is forbidden” by the gratuity provision “has the appearance of evil and the capacity of serving as a cover for evil.” H.R.Rep. No. 87-748, at 19 (1961). Defining that provision so narrowly as to preclude prosecution of information disclosure except in FOIA cases contravenes congressional intent and eliminates an important tool routinely used by prosecutors to fight public corruption.[20]
Third, the court’s disposition of this question does public officials no favor. Because the court’s opinion makes it impossible for a prosecutor to charge, or the jury to settle upon, a lesser included offense for conduct that most people would consider criminal, it makes it more likely that those who undertake such conduct will be charged with and convicted of the greater offense of bribery.[21] Indeed, Valdes — who the jury acquitted of the greater offense but convicted of the lesser — may well have been the beneficiary of such a resolution, the possibility of which the court now takes off the table.
B
There is nothing in the plain language of subsection 201(a)(3)’s definition of official act that precludes it from encompassing the disclosure of an agency’s — or the nation’s — secrets for pay. Whether to disclose such information can reasonably be viewed as a “decision or action” on a “question [or] matter” that “may by law be brought before any public official, in such official’s official capacity.” The court rightly warns that “every question-and-answer between an official and a citizen can[not] be brought within the statute.” Court Op. at 1329-30. I certainly agree that the term “question” does not encompass any sentence that ends in a question mark. Instead, as Muntain indicates, the types of “questions” covered by section 201 are those that may be “pending” or “may by law be brought before” the defendant public official. See 610 F.2d at 969. But there is no reason why we must conclude that Valdes’ conduct in this case did not constitute an action on just such a “question.” To find Valdes’ conduct covered by *1346 the statute is not to work a “judicial extension” of the congressional text, Court Op. at 1328; rather, the court’s contrary holding effects a judicial contraction.
The court reaches this result because, in my view, it misconstrues the “question” that is actually at issue in Valdes’ case. The “question” is not, as the court suggests in referring to Blake’s request for the name of the license holder: “What is your name?” or “Where do you live?” Court Op. at 1324, 1325. Rather, the question is: “What do the government’s files show is the name and address?” That is a question that was “pending” and “brought before [a] public official,” namely Valdes. And because access to WALES is restricted to law enforcement personnel, it is a question that Valdes could answer only in his “official capacity, or in [his] place of trust or profit.” In the court’s own formulation, that question — What do the government’s files show? — is a “[q]uestion[ ] ... subject to resolution by the government.” Court Op. at 1323-24. Indeed, just as “ ‘Should the police investigate this person?’ ... is clearly a question answered by the government,” id. at 1326, so too is “Should the police disclose the contents of law enforcement computer files?”
None of this conflicts with the dictum of Sun-Diamond. As discussed in Part II. B.l above, that dictum was aimed, as the Court itself said, at preventing absurdities from becoming gratuities — absurdities like the gift of a jersey for receiving a sports team at the White House, or the gift of a cap for visiting a high school. But there is nothing absurd about barring a government official from taking cash as a reward for disclosing the contents of restricted files. We should not, and we need not, foreclose the prosecution of such behavior by the manner in which we decide this case.
rv
Finally, I agree with my colleagues that the district judge’s jury instruction on the definition of “official act” was error. Court Op. at 1325. The judge refused the defendant’s request to include the statutory definition set out in subsection 201(a)(3), and instead instructed the jury that “the term official act means any decision or action within the scope of the public official’s authority.” J.A. 721. That refusal conflicts with Sun-Diamond’s directive to focus on “the definition of [official act],” 526 U.S. at 408, 119 S.Ct. 1402 (emphasis in original), and the court is right in holding that the government cannot satisfy its burden of showing that the error was harmless, Court Op. at 1325-26; cf. Sun-Diamond, 526 U.S. at 412-14, 119 S.Ct. 1402 (rejecting a claim that an erroneous jury instruction concerning the scope of subsection 201(c) was harmless).
But my colleagues’ conclusion that the jury instruction was error is without consequence to their analysis. Because they hold that no reasonable jury could have found Valdes’ conduct to constitute an official act, no jury instruction could have saved the conviction, and the case against him must be dismissed. For me, by contrast, the error is of consequence. Because it was not harmless, the judgment must be reversed. But because I regard the evidence as sufficient for a properly instructed jury to convict Valdes of accepting an illegal gratuity, I would remand the case for a new trial.
V
In a well-intentioned effort to avoid reading section 201 so broadly as to include the absurdities described in the Sun-Diamond dictum, the court has denied the government an important weapon in fighting official corruption. It is one thing to interpret section 201 as a “scalpel” *1347 rather than a “meat axe.” Court Op. at 1328 (quoting Sun-Diamond, 526 U.S. at 412, 119 S.Ct. 1402). It is quite another to turn the scalpel on the statute itself. Because today’s decision has that unintended consequence, I respectfully dissent.

. See MPD General Order 302.6, at 6 (J.E.A. 94) (“Information from-WALES [and] NCIC ... shall be used for official legitimate law enforcement purposes only.’[1]); id. (stating that MPD employees "making inquiries or receiving information on the Wales or [Regional Arrest Information Network] terminals] shall take extraordinary precautions to ensure that this information is not observable to unauthorized persons''); United States v. Jordan, 316 F.3d 1215, 1222 (11th Cir.2003) ("Access to ... NCIC is circumscribed by strict rules requiring that [it] be utilized for law enforcement purposes only.”).

. WALES "contains criminal history information regarding arrests, address information, physical description (race, sex, date of birth, height, weight, any scars or markings), police and correctional identification numbers, and warrant information. It also contains motor vehicle information (driver's licenses, vehicle registrations, vehicle identification numbers), social security numbers, aliases, fingerprint classifications, warnings about particular persons, arid attempts to locate both missing cars and people. In addition, 'WALES' interfaces with several other law enforcement records systems, including the National Law Enforcement Telecommunication System ('NLETS'), which allows an exchange of information between individual State databases and is maintained by the Federal Bureau of Investigation ('FBI'); the Criminal Justice Information System ('CJIS'), which contains arrest information from the police district[s] ..., and the National Crime Information Center ('NCIC'), which is maintained by the FBI.'' United States v. Hutchinson, 408 F.3d 796, 799 (D.C.Cir.2005).

. See, e.g., Hutchinson, 408 F.3d at 797-802; Dorman v. District of Columbia, 888 F.2d 159, 160-61 (D.C.Cir.1989); Duggan v. District of Columbia, 884 A.2d 661, 664 (D.C.2005); Thomas v. United States, 731 A.2d 415, 418 (D.C.1999); Duncan v. United States, 629 A.2d 1, 1 n. 1 (D.C.1993).

. See, e.g., Hutchinson, 408 F.3d at 801 ("By confirming that Hutchinson either was or was not providing false identification information to the police, a ‘WALES' check ultimately could assist Detective Hilliard in evaluating whether or not Hutchinson was the stabbing suspect.”); Thomas, 731 A.2d at 418 (noting that the officer began to suspect that the defendant had falsified his identity after running a WALES check); Duncan, 629 A.2d at 1 n. 1 (stating that a WALES check disclosed that the suspect's license had been suspended).

. See, e.g., Anderson v. Alameida, 397 F.3d 1175, 1178 (9th Cir.2005) (defendant placed "in custody as a fugitive from justice” after NCIC check revealed an outstanding arrest warrant); Childress v. United States, 381 A.2d 614, 616 (D.C.1977) (defendant arrested after WALES check revealed outstanding warrant).

. Moreover, the only reason that Valdes' conduct ended when it did was that the government arrested him. Valdes had shown no indication that he was unwilling to continue to conduct requested WALES searches — or take other investigatory steps — indefinitely.

. Cf. United States v. Ahn, 231 F.3d 26 (D.C.Cir.2000) (upholding an MPD officer’s guilty plea for accepting an illegal gratuity for not reporting illegal activity).

. See, e.g., United States v. Washington, 106 F.3d 983 (D.C.Cir.1997) (bribe to police officer to provide "protection” for a fictitious drug dealer); United States v. Neville, 82 F.3d 1101 (D.C.Cir.1996) (bribe to jail guard from a fictitious drug dealer); United States v. Kelly, 748 F.2d 691 (D.C.Cir.1984) ("Abscam” case, involving bribe to congressman to introduce private immigration bill for fictitious alien).

. Compare Oxford English Dictionary Online, http://www.oed.com (defining "moonlighting” as "[t]he practice of doing paid work in addition to one's regular employment”), with id. (alternatively defining the term as "[t]he performance of an illicit action by night”).

. See, e.g., United States v. Sedoma, 332 F.3d 20, 27-28 (1st Cir.2003); United States v. Herrera, 171 Fed.Appx. 446, 447 (5th Cir.2006).

. See, e.g., Sedoma, 332 F.3d at 22, 27; Gordon v. Borough of Middlesex, 268 N.J.Super. 177, 632 A.2d 1276, 1278 (1993).

. See, e.g., Herrera, at 447; United States v. Ruiz, 905 F.2d 499, 502 (1st Cir.1990).

. Valdes contends that, because Blake said the holders owed him money, the data would have been available under a statutory exception for use "in anticipation of litigation.” 18 U.S.C. § 2721(b)(4). But Blake did not mention litigation, and courts have read the exception narrowly. See, e.g., Wemhoff v. District of Columbia, 887 A.2d 1004, 1011 (D.C.2005) (holding that subsection (b)(4) can be invoked only when there is a bona fide investigation relating to actual or "likely” litigation).

. I address the separate issue of the erroneous jury instruction in Part IV.

. See also Court Op. at 1326-27 ("Even if Blake had sought license plate and warrant information about real people, that fact would not have transformed his five questions, or *1343 Valdes’s answers, or both, into ... any ... kind of ‘matter,’ etc., covered by § 201(a)(3).”)

. Cf. Parks v. United States, 355 F.2d 167, 169 (5th Cir.1965) (affirming bribery conviction for influencing an Air Force sergeant “to sell the names of the recruits which were in his custody and control” to a life insurance salesman).

. In relevant part, subsection 201(b)(2) states that whoever,
being a public official ... directly or indirectly, corruptly ... accepts ... anything of value ... in return for: (A) being influenced in the performance of any official act; ... [or] (C) being induced to do or to omit to do any act in violation of the official duty of such official or person; ... shall be fined ... or imprisoned ... or both....
18 U.S.C. § 201(b)(2) (emphasis added).

. Indeed, the principal case cited by the court, Parks v. United States, 355 F.2d at 168— 69, holds that both the- "official duty” and the "official act” provisions cover the case of an Air Force sergeant who sells the names of new recruits to an insurance salesman — a view of the statute that is directly contrary to that taken by the court today. See also United States v. Parker, 133 F.3d 322, 325-26 (5th Cir.1998) (interpreting "[a]cts that violate an official’s duly” as a subset of "official act[s]”); United States v. Alfisi, 308 F.3d 144, 151 n. 3 (2d Cir.2002) ("Subsections (A) and (C) undoubtedly overlap in some considerable measure, although resort to (A) seems most appropriate in the case of bribes regarding decisions involving the exercise of judgment or discretion, ... while use of (C) would be most appropriate in. the case of bribes to induce actions that directly violate a specific duty.”).

. See, e.g., United States v. Sutton, 801 F.2d 1346 (D.C.Cir.1986) (conviction under "official act” prong of bribery statute based in part on payment for disclosure of confidential information regarding Department of Energy settlement negotiations); Parks, 355 F.2d at 169 (upholding bribery conviction for paying an Air Force sergeant to sell names of new recruits, because the payment was made "with intent to influence his ... action on any ... matter ... pending ... before him” (omissions in original)).

. See, e.g., United States v. Gaines, Nos. 92-5446, 92-5501, 1993 WL 220206 (4th Cir. June 23, 1993) (illegal gratuities conviction, in which the official acts were the supplying of "confidential, sensitive, and classified” Navy information to defense contractors); United States v. Greenberg, 444 F.2d 369 (2d Cir.1971) (illegal gratuity conviction in a sting operation, where the official act was providing information concerning an IRS investigation); United States v. Viviano, 437 F.2d 295 (2d Cir.1971) (conviction in a sting operation for offering a gratuity for confidential information from IRS files).

. See Keeble v. United States, 412 U.S. 205, 212-13, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973) ("[I]t is no answer to petitioner’s demand for a jury instruction on a lesser offense to argue that a defendant may be better off without such an instruction. True, if the prosecution has not established beyond a reasonable doubt every element of the offense charged, and if no lesser offense instruction is offered, the jury must, as a theoretical matter, return a verdict of acquittal. But a defendant is entitled to a lesser offense instruction ... precisely because he should not be exposed to the substantial risk that the jury's practice will diverge from theory. Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction.”).